[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS K. KAHN**
**CLERK**

_____

No. 98-6829

_____

D.C. Docket No. CV-97-1002-CB-M

DONALD WAYNE HARTLEY, as next friend of
Erica Joy Hartley, PAMELA H. HARTLEY
as next friend of Erica Joy Hartley,

Plaintiffs - Appellees,

versus

TILLMAN PARNELL, Superintendent of
Education,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(October 28, 1999)**

Before CARNES, Circuit Judge, HILL, Senior Circuit Judge, and HOEVELER[*],
Senior District Judge.

_____

[*]Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida,
sitting by designation.

CARNES, Circuit Judge:

Defendant Tillman Parnell brings this interlocutory appeal from the district court's denial of his motion for summary judgment on the plaintiffs' 42 U.S.C. § 1983 and Title IX claims against him in his individual and official capacities. Because we conclude that Parnell was entitled to qualified immunity on the claims against him in his individual capacity, we reverse the district court's denial of summary judgment with respect to those claims. We also conclude that we lack jurisdiction over Parnell's appeal of the denial of summary judgment on the official capacity claims.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

## I. BACKGROUND

### A. FACTS

In November 1996, plaintiff Erica Joy Hartley (Ms. Hartley) was a 16-year-old high school student at Washington County High School in Washington County, Alabama. In addition to her required classes, Ms. Hartley was enrolled in a two-hour drafting class offered at the county's vocational technical school, which was located on a separate campus from the high school. Ms. Hartley's drafting class was taught by Kenneth Godwin. Besides knowing Godwin from class, Ms. Hartley knew him socially from church. Also, she was friends with Godwin's 16-year-old

2

son Kenny and had been a frequent guest in the Godwin house when visiting Kenny.

On November 1, 1996, Godwin took Ms. Hartley and eight other students from his drafting class to Birmingham to attend a two-day meeting of the Vocational Industrial Clubs of America, an organization several members of his class had joined. Godwin and the students stayed overnight at a Birmingham hotel. On the morning of November 2, 1996, Ms. Hartley and another student went to Godwin's room to ask him for the day's schedule. After talking briefly, Godwin directed the other student to return to her room. When Ms. Hartley attempted to leave, Godwin grabbed her, pulled her onto his lap, and hugged her. He then laid her down on the bed, ran his hands under her shirt, and rubbed her breasts. Eventually he picked her up, kissed her on the lips, hugged her again, and said "Kenny doesn't know what he's missing." After that he again rubbed her breasts before finally walking her to the door, saying, "You need to get ready." Ms. Hartley left and returned to her room.

Later that afternoon, on the drive back to Washington County, Godwin stopped at a gas station. While Ms. Hartley was getting money from her backpack, Godwin placed his hand under her shirt and again rubbed her breasts. As he did this, he said, "I'm cold." Later, after Godwin had returned all the other students,

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

3

except Ms. Hartley, to their homes, he stopped on the side of the road and pulled Hartley onto his lap. Godwin told her, "What happened in Birmingham stays in Birmingham. I took our friendship too far. I think a lot of you and I still have hopes for you and my son." Finally, he added, "I'm not apologizing because you are my sweetheart." He then drove her home.

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS K. KAHN**
**CLERK**

Godwin's acts came as a shock to Ms. Hartley. Godwin had never behaved in an inappropriate manner toward her in the past, he enjoyed a good reputation in the community, and he had never been accused of any sexual or otherwise improper behavior with his students. Because of her shock, Ms. Hartley did not report Godwin's acts to anyone but a few friends until her father confronted her after receiving an anonymous phone call. She then told her parents all that Godwin had done to her.

On November 11, 1996, Mr. Hartley contacted the local district attorney's office about his daughter's allegations, and that office immediately commenced an investigation. On November 13, 1996, at the suggestion of the district attorney's investigator, Ms. Hartley voluntarily wore a hidden microphone when she attended Godwin's class. It is unclear from the record whether Godwin said anything incriminating while he was being recorded on that occasion.

4

On the evening of November 13, 1996, Mr. Hartley reported his daughter's allegations to defendant Tillman Parnell, superintendent of the Washington County School Board. He also told Parnell the district attorney's office was conducting an investigation. This was the first time Parnell was informed of Ms. Hartley's allegations or the investigation. Although Parnell was Godwin's brother-in-law, the parties agree that before that time he had no reason to know of the allegations or to suspect that Godwin might engage in such behavior.

**FILED**

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99

THOMAS K. KAHN
CLERK

The next morning, Parnell met with Mr. and Mrs. Hartley, the principal of the Vocational School, and a school guidance counselor. Following that meeting, arrangements were made to separate Ms. Hartley from Godwin. Effective November 14, 1996, Ms. Hartley was removed from Godwin's class and placed in another class at the Vocational School.[1] In addition, Parnell says he left it to the principal and the guidance counselor to arrange supervision of school breaks in order to ensure the two were kept apart.

Parnell subsequently met with Godwin to discuss Ms. Hartley's allegations. Although Godwin admitted to kissing Hartley on the lips, he said it was an

---

[1]Mr. and Mrs. Hartley assert that their daughter was moved out of Godwin's class at their initiative and argue Parnell should not receive credit for that removal. However, they do not explain how Ms. Hartley could have been removed from the class without the cooperation of Parnell and the Vocational School's principal. Regardless of how it actually came about, the fact remains that she was removed from Godwin's class immediately after Parnell learned of the allegations.

accident and that he had meant only to kiss her on the forehead.  He also said he had touched her breast accidentally while trying to give her a hug.  Parnell believed Godwin's explanation.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

Aside from his meetings with Mr. and Mrs. Hartley and Godwin, Parnell did not conduct any other investigation into Ms. Hartley's allegations.  Parnell explained that he did not initiate his own investigation because he believed the district attorney's investigation would be "a cut above" any investigative effort he could make and that the official investigation "relieved" him of doing his own investigation.

On November 21, 1996, Godwin was arrested and charged with child abuse, but he was subsequently released on bond.  At the next Washington County School Board meeting following Godwin's arrest, Ms. Hartley told the board of her abuse by Godwin.  At the conclusion of that meeting, Parnell announced that the board would not take any action against Godwin until the criminal charges against him were resolved.  On April 15, 1997, Godwin entered a guilty plea to misdemeanor harassment and was sentenced to probation for one year.  Thereafter, at a May 1, 1997 school board meeting, Parnell recommended to the board that Godwin be placed on probation for one year and that a letter of reprimand be placed in his file.  Parnell, who had seen the documents relative to Godwin's plea and sentence, based

6

his recommendation on the sentence given by the court. The board voted against Parnell's recommendation. Parnell did not lobby the board to act on his recommendation nor did he learn why certain members voted against it.

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS K. KAHN**
**CLERK**

Following the board's decision to reject Parnell's recommendation, Ms. Hartley's parents reported Godwin to the Alabama State Board of Education. Since it was possible that the state board would choose to revoke Godwin's license, Parnell, whose term as superintendent expired July 1, 1997, did not make any further recommendation to the county school board concerning possible action against Godwin. After a hearing in August 1997, the state board revoked Godwin's teaching certificate in September 1997. The Washington County School Board then fired Godwin because he no longer had a certificate.

From November 14, 1996, the day Ms. Hartley was removed from Godwin's class, to his termination in September 1997, Godwin never touched, abused, or otherwise harassed Ms. Hartley. In fact, the only contacts Godwin had with Ms. Hartley at school after she was removed from his class were: (1) two occasions in which Godwin came into Ms. Hartley's classroom during class session, but not to see her; and (2) a few occasions in which Godwin passed Ms. Hartley at school while she was either getting off the bus, walking on the sidewalk, or coming from

the break-room.  Godwin never spoke to her on any of those occasions, except

once when he simply said, "Good evening."

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS  K. KAHN
CLERK**

## B.  PROCEDURAL HISTORY

In October 1997, Ms. Hartley, by and through her parents as next friends,

filed a six-count complaint against Parnell, the Washington County School Board,

the county school board members, and Godwin. For purposes of this appeal, the

only relevant claims are the three which were brought against Parnell in his

individual and official capacities.  Those three claims are as follows:  (1) a 42

U.S.C. § 1983 claim alleging that Parnell violated Ms. Hartley's Fourteenth

Amendment substantive due process rights; (2) a 42 U.S.C. § 1983 claim alleging

that Parnell violated Ms. Hartley's Fourteenth Amendment equal protection rights;

and (3) a claim alleging that Parnell violated Ms. Hartley's rights under Title IX of

the Education Amendments of 1972 (Title IX), Pub. L. 92-318, 86 Stat. 235, 373

(1972), (codified as amended at 20 U.S.C. § 1681 et seq.).

Parnell subsequently moved for summary judgment with respect to each of

the three claims against him.  In that motion, he argued he was entitled to qualified

immunity on the individual capacity claims.  By order dated October 9, 1998, the

8

district court summarily denied Parnell's motion.  Parnell then filed this interlocutory appeal.

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS  K. KAHN**
**CLERK**

## II.  ANALYSIS

On appeal, Parnell contends that the district court erred in denying him summary judgment on the basis of qualified immunity insofar as the claims against him in his individual capacity are concerned.  He also contends that the court erred in denying him summary judgment on the claims against him in his official capacity.  We address each issue in turn.

### A.  WHETHER THE DISTRICT COURT ERRED IN DENYING PARNELL QUALIFIED IMMUNITY ON THE CLAIMS AGAINST HIM IN HIS INDIVIDUAL CAPACITY

"Because qualified immunity provides the right not to be burdened by trial, and not simply a defense to liability, this Court has jurisdiction to review interlocutory appeals from orders denying summary judgment based on qualified immunity.  We review this question of law de novo." Tinney v. Shores, 77 F.3d 378, 380 (11th Cir. 1996) (citations omitted).

Government officials performing discretionary functions are entitled to qualified immunity "insofar as their conduct does not violate clearly established

9

statutory or constitutional rights of which a reasonable person would have known."

Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  There is

no dispute that Parnell was acting within his discretionary authority as a public

official at all times relevant to this case.  Accordingly, the issue before us is

whether Parnell's conduct violated clearly established statutory or constitutional

rights of which a reasonable person would have known.

**FILED**

**U.S. COURT OF APPEALS**

**ELEVENTH CIRCUIT**

**10/28/99**

**THOMAS  K. KAHN**

**CLERK**

The Supreme Court has stated that "[a] court evaluating a claim of qualified

immunity must first determine whether the plaintiff has alleged the deprivation of

an actual [statutory or] constitutional right at all, and if so, proceed to determine

whether that right was clearly established at the time of the alleged violation."

Wilson v. Layne, --- U.S. ---, ---, 119 S. Ct. 1692, 1697 (1999) (citation and

quotation omitted). Therefore, we must first determine whether the facts, read in

the light most favorable to Ms. Hartley, establish that Parnell's actions deprived

her of any statutory or constitutional rights.  If the answer is "yes," we must then

consider whether those rights were clearly established at the time of the events in

this case.

As mentioned earlier, Ms. Hartley contends Parnell deprived her of her

Fourteenth Amendment substantive due process rights, her Fourteenth Amendment

10

equal protection rights, and her rights under Title IX.  We address whether Parnell

is entitled to qualified immunity on each of those claims.

1.  The Fourteenth Amendment Substantive Due Process Claim

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS  K. KAHN**
**CLERK**

Ms. Hartley contends that Parnell is liable under § 1983 for depriving her of

her Fourteenth Amendment substantive due process right not to be sexually abused

by a state official acting under color of state law.  Parnell appears to concede that

Ms. Hartley had a constitutional right not to be sexually abused by a state official

and that Godwin's actions deprived Hartley of that right.  We assume so for present

purposes. Parnell argues, however, that under the circumstances of this case, he

cannot be held liable under § 1983 for Godwin's acts because he did not cause that

deprivation.  We agree.

It is well established in this circuit that supervisory officials are not liable

under § 1983 for the unconstitutional acts of their subordinates "on the basis of

respondeat superior or vicarious liability." Belcher v. City of Foley, 30 F.3d 1390,

1396 (11th Cir. 1994) (citation and quotation omitted).  "Supervisory liability

[under § 1983] occurs either when the supervisor personally participates in the

alleged constitutional violation or when there is a causal connection between

actions of the supervising official and the alleged constitutional deprivation.  The

causal connection can be established when a history of widespread abuse puts the

11

responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted). In addition, the causal connection may be established and supervisory liability imposed where the supervisor's improper "custom or policy . . . result[s] in deliberate indifference to constitutional rights." Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (citing Zatler v. Wainwright, 802 F.2d 397 (11th Cir. 1986)).

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

Here, Parnell did not personally participate in Godwin's sexual abuse of Ms. Hartley, and there is no evidence of any prior inappropriate acts by Godwin that should have put Parnell on notice that Godwin might commit such abuse. Nor is there any evidence that Parnell, as superintendent, had any sort of policy in place prior to the sexual abuse which could have led Godwin to believe that sexual abuse of students was permitted by Parnell. Accordingly, assuming Ms. Hartley has a substantive due process right not to be sexually abused by a teacher, Parnell did not deprive her of that right. Because Parnell did not deprive Ms. Hartley of any substantive due process right, the district court erred by failing to grant Parnell qualified immunity on the substantive due process claim.

2. <u>The Fourteenth Amendment Equal Protection Claim</u>

Next, Ms. Hartley contends Parnell is liable under § 1983 for violating her

Fourteenth Amendment right to equal protection by failing to remedy Godwin's

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**

**THOMAS K. KAHN**
**CLERK**

sexual abuse. She argues that Parnell violated her equal protection rights by

deciding not to either seek Godwin's termination or suspend him from teaching at

her school after he was aware of her allegations of sexual abuse. We disagree.

After Parnell learned of Ms. Hartley's allegations of sexual abuse, Ms.

Hartley did not suffer any further sexual abuse, sexual harassment, or harm of any

sort while attending the Washington County public schools. In the absence of any

evidence of injury to Ms. Hartley after Parnell learned of her allegations, we hold

that Parnell did not deprive Ms. Hartley of her Fourteenth Amendment right to

equal protection.[2]

In so holding, we in no way suggest that Parnell's decision not to terminate

or suspend Godwin would have rendered him automatically liable for depriving

Ms. Hartley of her constitutional rights even if she had suffered further harm of

some sort. Because Ms. Hartley did not suffer any injury following Parnell's

---

[2]We note that contrary to the representations of Ms. Hartley's counsel at oral argument, there is no evidence in the record that Ms. Hartley experienced any kind of emotional injury attributable to her sporadic contact with Godwin at school after she was removed from his class. Because there is no evidence of such injury, we need not address whether a plaintiff may rely on an emotional injury alone to establish a deprivation of her Fourteenth Amendment right to equal protection.

13

awareness of her allegations of abuse, we simply have no occasion to consider the circumstances under which a school supervisor may be held liable under the equal protection clause of the Fourteenth Amendment for harm suffered by a student after the supervisor learned of prior sexual abuse by a school employee.

**FILED**

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99

THOMAS K. KAHN
CLERK

Because Parnell did not deprive Ms. Hartley of her Fourteenth Amendment right to equal protection, the district court erred in denying Parnell qualified immunity on this claim.

### 3. The Title IX Claim

Finally, Ms. Hartley contends Parnell is liable under Title IX for failing to adequately respond to Godwin's sexual abuse. Ms. Hartley is incorrect. Individual school officials, such as Parnell, may not be held liable under Title IX. See Floyd v. Waiters, 133 F.3d 786, 789 (11th Cir.) ("[A] Title IX claim can only be brought against a grant recipient--that is, a local school district--and not an individual.") (citations and quotations omitted) vacated, --- U.S. ---, 119 S. Ct. 33 (1998), reinstated, 171 F.3d 1264 (11th Cir. 1999) petition for cert. filed (U.S. July 6, 1999) (No. 99-5197). Accordingly, the district court erred in denying Parnell qualified immunity on the Title IX claim.

### 4. Qualified Immunity Where There is No Underlying Constitutional Violation

14

The concurring opinion takes the position that the doctrine of qualified immunity does not apply in an individual capacity public official lawsuit, unless a court determines that a constitutional violation has been alleged (if at the motion to dismiss stage) or a genuine issue of material fact concerning such a violation exists (if at the summary judgment stage). To suggest that qualified immunity applies where no wrong has been committed, it says, is a non sequitur. What we ought to do, according to the concurring opinion, is direct the district court to enter summary judgment for the individual defendant on the merits, not on qualified immunity grounds. We disagree.

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

Let us begin with why it matters. It matters because this is an interlocutory appeal, and courts of appeal have jurisdiction to review interlocutorily denials of summary judgment based on qualified immunity, but not denials of summary judgment that go only to the merits of a claim. See Johnson v. Jones, 115 S.Ct. 2151 (1995); Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18 (1985). The reason we have interlocutory jurisdiction when a qualified immunity defense is rejected is that the values and interests protected by that doctrine make it essential that a valid qualified immunity defense be vindicated sooner instead of later. See Mitchell, 472 U.S. at 525 - 27, 105 S.Ct. at 2815 - 16. If there had been no qualified immunity defense raised in this case – if the only grounds for which

15

summary judgment had been sought was on the merits – the denial of summary judgment would not be appealable; we would have to dismiss this appeal for lack of appellate jurisdiction. See Swint v. Chambers County Commission, 514 U.S. 35, 43, 115 S.Ct. 1203, 1208 (1995). It is only because of the qualified immunity issue that we have appellate jurisdiction to review the denial of summary judgment. That is what Mitchell v. Forsyth and the host of decisions following it mean.

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

To be sure, the matter is not without nuance. After all, where there is an appeal from the denial of a motion to dismiss or summary judgment on qualified immunity grounds, we can and do review the underlying merits issue that is swept along in the appeal. At first, the Supreme Court told us we could decide the underlying merits issue, see Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789 (1991); then we were told it was "the better approach" to do so, County of Sacremento v. Lewis, 118 S.Ct. 1708, 1714 n. 5 (1998); and lately the Supreme Court has instructed us that we must first decide the merits issue, and only if we decide that in favor of the plaintiff, i.e., conclude that the violation of a bona fide federal right has been alleged or evidenced, should we reach the issue of whether that right was clearly established at the time of the violation. See Wilson v. Lane, 119 S.Ct. 1692, 1697 (1999); Conn v. Gabbert, 119 S.Ct. 1292, 1295 (1999).

16

But still, the denial of a qualified immunity defense is the only procedural

vehicle a plaintiff can use to  bring to us at the pretrial stage, instead of after final

judgment, any question relating to the merits. Only as it arises in the context of the

qualified immunity issue can any question about the merits be reviewed

interlocutorily. The  Supreme Court has characterized the merits issue as "an

analytically earlier stage of the inquiry into qualified immunity." See Siegert, 111

S.Ct. at 1791.  It is the earlier one of two stages of the qualified immunity inquiry.

That characterization came in a case in which the Court said it had granted

certiorari "in order to clarify the analytical structure under which a claim of

qualified immunity should be addressed." Id. at 1793.  In its clarification, the Court

labeled the merits inquiry  "the first inquiry" in deciding whether the qualified

immunity defense applies in a case. Id. (The second inquiry is whether the violated

federal right, if any, was clearly established.)  Likewise, in its recent Wilson

opinion, the Supreme Court described the determination of the merits as part of the

process of evaluating a qualified immunity claim:

> A court evaluating a claim of qualified immunity  "must first
> determine whether the plaintiff has alleged the deprivation of an
> actual constitutional right at all, and if so, proceed to determine
> whether that right was clearly established at the time of the alleged
> violation."

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS  K. KAHN**
**CLERK**

17

119 S.Ct. at 1697 (quoting Conn v. Gabert, 119 S.Ct. 1292, 1295 (1999)). Thus, determining the merits of a claim is part and parcel of the qualified immunity inquiry, not a separate question.

Our own decisions recognize as much, and they are inconsistent with the approach the concurring opinion would have us take. For example, in Burrell v. Board of Trustees of Ga. Military College, 970 F.2d 785, 792-93 (11ᵗʰ Cir. 1992), the plaintiff claimed that two individual defendants had conspired with another to have her fired in retaliation for protected speech, those two defendants moved for summary judgment on qualified immunity grounds, the district court denied that motion, and they appealed. After examining the record we concluded that there was insufficient evidence to support a finding that such a conspiracy had existed. And, we reasoned: "Without a conspiracy, there obviously is no constitutional violation. Without a constitutional violation, there can be no violation of a clearly established constitutional right." Id. at 792. Having reached that conclusion, we did not direct the district court to enter summary judgment on the merits, as the concurring opinion would have us do. Instead, what we did in Burrell was "reverse the district court's denial of summary judgment on the ground of qualified immunity." Id. at 796. Likewise, in Cottrell we concluded, "plaintiff has failed to show a violation of due process, and it necessarily follows that the defendants are

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

18

entitled to summary judgment on qualified immunity grounds." 85 F.3d at 1491 - 92. We said, "the district court should have granted their motion for summary judgment on qualified immunity grounds," and we reversed its failure to do so. See id.

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

It would be inconsistent with our prior decisions to hold either that the district court did not err in denying the plaintiff in this case qualified immunity, or to reverse it for failing to grant summary judgment on the merits. Because our only basis for appellate jurisdiction at this stage of the case is fastened to the issue of qualified immunity, it would be incongruous for us to deny that the issue before us is one of qualified immunity. Instead of denying that which is essential, we will recognize that qualified immunity is the issue we are deciding, and we will do here what we did in Burrell and Cottrell, which is to reverse the district court's denial of the individual plaintiff's motion for summary judgment on qualified immunity grounds.

B. WHETHER THE DISTRICT COURT ERRED IN DENYING PARNELL SUMMARY JUDGMENT ON THE CLAIMS AGAINST HIM IN HIS OFFICIAL CAPACITY

We do not have interlocutory appellate jurisdiction to review a denial of summary judgment on an official capacity claim standing alone. See, e.g., Swint v. Chambers County Commission, 514 U.S. 35, 50-51, 115 S. Ct. 1203, 1211-12

19

(1995). To the extent we have discretionary pendent appellate jurisdiction over the denial of summary judgment on the official capacity claim because it is intertwined with the qualified immunity issue, see id., we decline to exercise that jurisdiction, see, e.g., Pickens v. Hollowell, 59 F.3d 1203, 1208 (11th Cir. 1995). Of course, it may be appropriate for the district court to re-visit its decision on the official capacity claim in light of this opinion.

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS K. KAHN**
**CLERK**

## III. CONCLUSION

That portion of the district court's October 9, 1998 order denying Parnell's motion for summary judgment on the § 1983 and Title IX claims against him in his individual capacity is REVERSED. Parnell's appeal of the district court's denial of summary judgment on the claims against him in his official capacity is DISMISSED for lack of jurisdiction. The case is REMANDED for further proceedings consistent with this opinion.

HILL, Senior Circuit Judge, concurring:

I have had the distinct privilege of reviewing the works of Judges Carnes and Hoeveler which both explore our responsibilities in this interlocutory appeal. In the intellectual sense, both opinions are certainly well done. However, insofar as the rights, responsibilities and liabilities of the parties before us are concerned, their differences seem to be of little, if any, importance.

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS K. KAHN**
**CLERK**

With this said, as I see it, there are more angels dancing on Judge Carnes' pin than on Judge Hoeveler's. I therefore concur in the opinion for the panel by the former.

Both opinions lead to a reversal and a judgment in appellant's favor. But a reversal of what? A reversal of a judgment of the district court denying summary judgment in favor of appellant's defense of qualified immunity.

Judge Hoeveler[1] would go a step further, cut across some appellate cobwebs, and, striking at the jugular vein, instruct the trial judge to dismiss the case on the merits. Thus would a district judge be spared further consideration of a case already found of no virtue by the court of appeals. That makes a lot of, perhaps facial, sense.

---

[1]Judge Hoeveler has been one of the heaviest laden district judges in America, and continues to be one of the most thoughtful.

21

Judge Carnes, on the other hand, would redirect our attention to our limited appellant responsibilities.  This is an interlocutory appeal.  We do not take appeals piecemeal.  We are authorized to review cases *after final judgment.* 28 U.S.C. § 1291.  Except, of course, there are a few exceptions (there are always exceptions!).

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS  K. KAHN**
**CLERK**

Some rules of law protect us against more than just liability.  Some protect us against the exposure of a trial.  For example, a criminal defendant, protected from subjection to double jeopardy by the Constitution, but ordered to trial by the district court, may appeal the order denying his plea of double jeopardy before any further proceedings in the trial court.  *See Abney v. United States,* 97 S.Ct. 2034 (1977).

Here, a defendant, entitled to protection from exposure to trial by virtue of the fact that he is immune from such a claim, is entitled to appeal the denial of his plea of qualified immunity before judgment – indeed, before trial.  *See Johnson v. Jones*, 115 S.Ct. 2151 (1995).  We have no further right to interfere with the *pendente lite* rulings of the district court in such a case.  We must address the immunity issue and that alone.  *Id.*

There is merit in this.  If we invited the parties to brief and argue before us prior rulings, the interlocutory appeal of one order would become a piecemeal appeal of all orders.  A defendant with scant, if any, real claim to immunity, could

22

appeal its denial in order to have the appellate court straighten out rulings on discovery, pretrial orders, deposition settings and the rest. That would not do.

Here, we have the case that obscures our function. It was bound to show up some day![2] In order to rule on the narrow qualified immunity issue, it is necessary that we examine the constitutional wrong alleged to have been done so that we can determine whether or not it was "clearly established." Lo and behold, we find that there is no "clearly established" constitutional violation (because no constitutional violation of *any* kind was ever asserted) so we reverse the district court and order that summary judgment in favor of the defendant be entered. That, I believe, ends our appellate jurisdiction of this interlocutory appeal.

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS K. KAHN**
**CLERK**

We then send the case back to the district judge without observing that the *basis* of our ruling, set out parenthetically above, that no constitutional wrong was asserted, may also be the basis for a dismissal of the case on the merits. It would be, I apprehend.[3] On the face of it, we ought to go ahead and say so in our judgment, as Judge Hoeveler suggests. But we must be careful that our judgment

---

[2] A fine lawyer for the State of Georgia, who later became its supreme court's Chief Justice, the Honorable Harold N. Hill, Jr., once argued a political issue case for the state before the Supreme Court. He said: "Your honors, we have found that if anything *can* happen, it *will* happen!" *Fortson v. Morris*, 87 S.Ct. 446 (1966).

[3] I suggest that the district judge will see that this is so, perhaps wondering why we didn't just say so!

23

here not set a precedent to include depositions, discovery and all the rest in future interlocutory appeals of this kind.

Even though the issue before us would be resolved alike in both, the two opinions here are useful. Their divergent views don't interest the parties as much as they can be expected to intrigue those who write articles for law reviews. Interlocutory appellate jurisdiction is grist for these millers.

TIM-BER!!!

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**

**THOMAS. K. KAHN**
**CLERK**

HOEVELER, District Judge, concurring:

I concur in the opinion of Judge Carnes. I do, however, question the manner in which we remand the case to the District Court. When qualified immunity is asserted as a defense, a court must first determine whether the violation of a constitutional right is asserted, then determine whether that right was clearly established (if not, then qualified immunity applies). "Deciding the constitutional question before addressing the qualified immunity question ... promotes clarity in the legal standards for official conduct." <u>Wilson v. Layne</u>, 119 S. Ct. 1692 (1999) (holding that the right violated was not clearly established at the time of the offense). Although the Supreme Court in <u>Wilson</u> did not address the application of qualified immunity, it affirmed the appellate court's conclusion that qualified immunity was proper. Following the direction of the Supreme Court in <u>Wilson</u> we look first to determine if a constitutional violation has been alleged and, in this case, if there is any evidentiary basis, on a motion for summary judgment, for such a charge. We find that there is not.

Qualified immunity is invoked to protect the unwary -- and, thus, essentially innocent -- public servant who, in fact, has committed the violation. Immunity is unnecessary if he has not. Thus the District Court did not err in denying Parnell qualified immunity. The Court erred in not granting summary judgment for

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

25

Parnell because of the absence of any issue on the question of a constitutional violation. This is what we have determined.

To suggest that qualified immunity protects Parnell, where we have determined that he committed no wrong, appears to be a non sequitur. When the District Judge addresses this case he will, of course, be faced with the dilemma of entering judgment for Parnell on the basis of qualified immunity where, clearly, it does not apply. I find no problem with simply remanding for the entry of judgment consistent with our findings. To do otherwise seems to further complicate an already complex body of law. I find no impediment in our simply remanding with directions consistent with our view; that our jurisdiction to entertain this appeal grows out of the denial of a qualified immunity defense should not affect our right to fully dispose of the issues before us on appeal -- consistent with applicable law. Indeed, we do so as to the Title IX claim.

Finally, if due to the interlocutory nature of this appeal we must be limited in our directions to the District Court, our directions should simply require action in conformity with our conclusions rather than entering an order which appears inappropriate after the findings of this court.

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**10/28/99**
**THOMAS K. KAHN**
**CLERK**