**FOR PUBLICATION**

# In the
# United States Court of Appeals
## For the Eleventh Circuit

———————————————

No. 23-10273

———————————————

ANTHONY DAVID NUTE,

*Plaintiff-Appellee*
*Cross-Appellant,*

*versus*

BRYANT DEAN WHITE,

*Defendant-Appellant*
*Cross-Appellee,*

LUCAS G. YARBOROUGH,

*Defendant.*

———————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:21-cv-01563-CLM

———————————————

Before NEWSOM, BRASHER, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Rainsville City Police officers arrested Anthony Nute for misdemeanor assault, public intoxication, and resisting arrest. The Chief of Police directed one of them, Officer Bryant White, to transport Nute to the county jail in Fort Payne because there were better medical personnel there than at the city jail. After White took Nute into the jail, the jailers became frustrated with Nute during the booking process and beat him in the presence of White, who did not attempt to intervene.

Nute sued White and others under 42 U.S.C. § 1983. One of his claims against Officer White was that his failure to intervene while Nute was being beaten violated the Fourth Amendment. The district court denied White's motion for summary judgment on qualified immunity grounds. This is his interlocutory appeal of that denial.

## I. The Facts Construed in the Light Most Favorable to Nute

In reviewing a summary judgment decision, we view the evidence in the light most favorable to the non-movant, in this case Nute. *See Swint v. City of Wadley*, 51 F.3d 988, 992 (11th Cir. 1995).

### A. The Arrest

On March 1, 2020, one of Anthony Nute's neighbors in Rainsville called 911 because she saw Nute standing in the yard in his underwear. Two City of Rainsville police officers, Officers White and Yarbrough, responded to that call.

Video footage from one of their body cameras shows that the officers found Nute standing in the yard in a pair of boxer shorts

with his pants down around his ankles. He was staring off into space, breathing almost convulsively, and he refused to respond to the officers. When one of them moved closer to him, Nute shouted, "Get away from me!" Nute appeared to be in a trance and under the influence of some powerful drug. The officer told Nute to stay where he was, continued to call his name, and asked him what he had taken. Nute continued to ignore the officers' attempts to communicate with him.

One of the officers requested that the 911 dispatcher send paramedics to the scene. The paramedics arrived and tried unsuccessfully to communicate with Nute. As one of them got close to him, Nute swung his right arm at the man. After three more minutes of unsuccessful attempts at communication, and after Nute had failed to respond to repeated orders to put his hands behind his back, the officers wrestled him to the ground, tased him, and handcuffed his arms and legs behind his back.

The Chief of Police arrived at the scene. He directed that Nute be taken to the county jail, which was better able to handle someone in his condition than the city jail. Officer White transported Nute to the county jail, which is located in the City of Fort Payne.

### B. Events at the County Jail

County jailers met Officer White once he arrived at the jail with Nute. While in the lobby or entrance room at the jail, White and some jailers put Nute on the floor to undo the arm and leg restraints that had been put on him in Rainsville after his arrest

there. They held Nute on the floor while one of them unlocked the handcuffs that had been restraining his arms and legs behind his back.

Once Nute's restraints were removed, the jailers forcibly pulled him up from the floor and pushed him into a side room. Three jailers and Officer White went with Nute into that room. A jail surveillance video shows what happened inside the side room. Within seconds after the group entered it, the three jailers cornered Nute. Officer White stood near the doorway, approximately five to ten feet behind the jailers and Nute.

About thirteen seconds after they all had entered the side room, one jailer punched Nute in the face, and at the same time, another jailer smacked him over the top of the head with an open hand. They landed their apparently unprovoked blows in rapid succession. A couple of seconds later Officer White took three or four steps towards where the jailers and Nute were, stopping himself about three to five feet away from them. Other than taking those steps, Officer White did nothing.

Approximately ten seconds after inflicting the first two blows, one of the jailers hit Nute in the face again with an open hand. About two seconds later, another one hit him over the top of the head with an open hand. A third jailer then forcibly pushed Nute into the corner of the room. White watched it all from a few feet away.

Several seconds after those blows, the jailers attempted to wrestle Nute to the ground and one of them hit him across the side

of his head with an open hand. Without saying a word, Officer White turned around and started walking out of the room. Before he went through the doorway, he paused, turned back, and watched for six more seconds as the jailers continued to beat Nute who was lying helplessly on the floor. White said nothing and left.

It was about twenty-seven seconds after the jailers first hit Nute, and while they continued to beat him, that White turned and left the room where the assault was taking place. On his way out of the jail, White didn't talk to anyone about the beating he had seen. He testified at his deposition that it never occurred to him to mention the beating to any supervisors at the jail.

Officer White later admitted that as he watched the beating happen he knew the jailers were unlawfully using force against Nute. He testified:

> Q. And they [the three jailers] pushed [Nute] up against — beat him up against a wall over there and beat him and continued to beat him for some period of time, didn't they?
>
> A. Yes, sir.
>
> Q. And you sat and you watched that, correct?
>
> A. Yes.
>
> Q. Did you take any action to or did you speak with them at all, did you make any effort to stop them from beating Mr. Nute?
>
> A. No, I did not.

> Q. . . . *Did you recognize that what [the jailers] were doing was unlawful?*
>
> A. *Yes.*

(Emphasis added.) After he had testified in his deposition that he did nothing to stop the beating he knew was unlawful, White submitted an affidavit stating that after witnessing the assault he left the jail, got into his vehicle, called his police chief, and "told him what had happened." The Chief of Police did not testify or sign an affidavit, and there is nothing in the record to indicate what, if anything, the Chief did or whether he was in a position to do so.

After White left the room where the jailers were beating Nute, they continued to repeatedly punch, knee, and kick him. Ten seconds after White left the room, the jailers pointed their tasers at Nute, and one of them tased him. About ten seconds after that, another jailer tased him. Then, for the next twenty or so seconds, one jailer stood with his foot on Nute's back while another tried to remove Nute's clothes (presumably to put a jail jumpsuit on him). Meanwhile, the third jailer repeatedly punched and kneed Nute in the side and back. Then, over the span of about twenty-five seconds, a jailer tased Nute several times while a different one kicked him in the stomach. The jailers struggled with Nute until they had disrobed him completely.

For the next minute, Nute was lying naked on the floor, apparently crying out in pain. The jailers forced him to stand up with his bloodied face against one of the corners of the room. He stood like that for a little more than a minute until suddenly one of the

jailers punched him in the head. Another one immediately pepper-sprayed Nute in the face for five seconds. A minute later a jailer punched him in the ribs. Six seconds later a different jailer punched him in the stomach. After that, the jailers took Nute out of view of the jail surveillance camera.

All told, for at least six minutes following White's departure from the room where he had witnessed, without any attempt to intervene or protest, an ongoing assault on the helpless Nute, the assault continued and he was repeatedly punched, kicked, kneed, pepper-sprayed, and tased.

The beating the jailers inflicted on Nute broke bones in his face and ribs and caused numerous cuts and bruises all over his body. For their criminal conduct, the three of them were criminally prosecuted. Jailers Jackson and Tyson were convicted of Assault in the Second Degree, a felony, and sentenced to 9 years and 12 months. *See* Docket for Case, Dekalb County Circuit Court, *State v. Jackson*, CC-2021-000424.00, https://perma.cc/M7V5-ZVQC; Docket for Case, Dekalb County Circuit Court, *State v. Tyson*, CC-2021-000417.00, https://perma.cc/A8AG-LWMD; *cf. Keith v. Dekalb County*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) (taking judicial notice of an online state court records system like Alacourt). For Jailer Brown there are no publicly available records.

C. This Lawsuit and the Denial of Summary Judgment

Nute filed a 42 U.S.C. § 1983 lawsuit against Officers White and Yarbrough, who had arrested him. He claimed that the arrest was without probable cause in violation of the Fourth

Amendment. He also claimed that Officer White violated his Fourth Amendment rights when he did not intervene to stop the jailers' use of excessive force against him.

The parties filed cross-motions for summary judgment. Nute sought partial summary judgment on liability for both of his claims, which the court denied. The officers sought summary judgment on qualified immunity grounds on each of the claims against them. The court granted summary judgment to both officers on the unconstitutional arrest claim but denied it to White on the failure to intervene claim against him. This is White's interlocutory appeal from the denial of summary judgment on that claim, in which he contends that he is entitled to qualified immunity.[1]

## II. The Qualified Immunity Issue

"We review *de novo* a district court's denial of summary judgment based on qualified immunity, applying the same legal standards that governed the district court." *Feliciano v. City of*

---

[1] Nute has not attempted to appeal the denial of his motion for summary judgment on the false arrest claim, but he has cross-appealed the denial of his summary judgment motion on liability on his failure to intervene claim. We do not have interlocutory appellate jurisdiction to review that denial of summary judgment in favor of Nute on liability grounds on the failure to intervene claim standing alone. *See Hartley v. Parnell*, 193 F.3d 1263, 1272 (11th Cir. 1999); *see also Swint v. Chambers Cnty. Comm'n,* 514 U.S. 35, 50–51 (1995). While it's true that we may exercise our discretionary pendent appellate jurisdiction over Nute's cross-appeal to the extent it is intertwined with the qualified immunity issue, we decline to do that here. *See Hartley*, 193 F.3d at 1272.

*Miami Beach,* 707 F.3d 1244, 1247 (11th Cir. 2013).  Summary judgment is appropriate when the record evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

### A.  The Discretionary Authority Requirement

To be eligible for qualified immunity, Officer White must show that he "was acting within the scope of [his] discretionary authority" at the time of the conduct giving rise to the claim.  *See Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).

"When we assess whether an officer acted within his discretionary authority, 'we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.'" *Donald v. Norris*, 131 F.4th 1255, 1263 (11th Cir. 2025) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004)).  The question is not "whether it was within the defendant's authority to commit the allegedly illegal act."  *Id.* (quotation marks omitted).  Instead, the question is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an  official's discretionary duties." *Id.* at  1264  (quotation  marks omitted).  Or put a little differently, we are to determine "whether the decision" that Officer White "faced produced choices of action that were within the 'arsenal of powers with which to accomplish [his] goals.'" *See id.* (quoting *Holloman*, 370 F.3d at 1267).

Officer White asserts that he was "acting within his discretionary officer authority as a police officer for the City of Rainsville when he *transported* the plaintiff to the DeKalb County Jail." Br. of Appellant at 26 (emphasis added). But that is not the question. It isn't because the beating Officer White witnessed and his failure to intervene didn't occur while he was transporting Nute to the jail; it happened after he arrived at the county jail with Nute. The relevant inquiry is whether White was clothed with his full law enforcement powers and therefore acting within his discretionary authority even *after* he left the City of Rainsville, when he arrived at the Dekalb County jail in Fort Payne with Nute, and while he watched the jailers there beat him.[2] He was.

The question is what the scope of Officer White's authority as a law enforcement officer was while he was in the Dekalb County Jail. That's a question of state law. *See Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018). Under Alabama law,

---

[2] The answer to that question matters for another important reason as well. Officer White's principal theory in support of his view that he is entitled to qualified immunity (on the clearly established law prong) is that "[n]o controlling precedent clearly established that [he] had the *legal authority*, much less a constitutionally mandated obligation, to intervene outside his own police jurisdiction." Reply Br. of Appellant at 18 (emphasis added). In White's view, as a City of Rainsville police officer in the DeKalb County Jail in Fort Payne, he had no "legal authority" to intervene and attempt to stop an ongoing assault happening 5 to 10 feet in front of him. But as we explain in the text, above, as a matter of Alabama law, Nute is wrong about his legal authority and duties not extending beyond the city limits of Rainsville. *See* Ala. Code § 15-10-1.

an officer of one city has the same legal authority to make an arrest and exercise the other powers of a law enforcement officer within "any incorporated city or town within the limits of the [same] county" as he has in the city that employs him. *See* Ala. Code § 15-10-1. Because the DeKalb County Jail in Fort Payne is located within the same county as Rainsville, Officer White had the same legal authority as a police officer while he was in that jail as he would have in a jail or anywhere else in Rainsville. *See id*. That means to the extent he responded (or failed to respond) to the jailers' assault, he did so within the realm of his "discretionary duties" as a Rainsville police officer to attend to an arrestee in his presence. It means that when White witnessed the ongoing assault in the Dekalb County Jail he had "choices of action that were within the arsenal of powers," *Donald v. Norris*, 131 F.4th at 1263, that he had as a law enforcement officer.

While that is good news for Officer White on the discretionary authority gateway requirement to qualified immunity, it is not good news for him on the merits of the qualified immunity issue.

### B. The Clearly Established Law Requirement

Because Officer White's actions (or inactions) were within the scope of his discretionary authority, the burden shifts to Nute to show that White is not entitled to qualified immunity. To do that Nute must establish it was clearly established at the time he was assaulted that White's failure to intervene violated his Fourth Amendment rights.

The clearly established law requirement can be met through one of three ways:

> (1) case law with indistinguishable facts clearly establishing the constitutional right;
>
> (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or
>
> (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc) (quotation marks omitted).

At the heart of the inquiry into whether Officer White violated clearly established law lies this question: "Did [he] have fair warning when [he] engaged in the conduct giving rise to the claim that the conduct was unconstitutional?" *Cantu v. City of Dothan*, 974 F.3d 1217, 1233 (11th Cir. 2020). If so, he is not entitled to qualified immunity. *See id.* at 1235.

### 1. The General Duty to Intervene

We have long recognized that "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *See, e.g.*, *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (quotation marks omitted); *see also Helm v. Rainbow City*, 989 F.3d 1265, 1272 (11th Cir. 2021) ("The principle that an officer must intervene when he or she witnesses unconstitutional force has been clearly established in this Circuit for

decades."); *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir. 1986).  Officer White and Nute do not disagree about that.

They do disagree about whether it was clearly established in March 2020 that an Alabama city police officer who was outside of his city limits had a duty to take reasonable steps to intervene to stop the unlawful use of force by officers employed by a different law enforcement agency.  Officer White contends that the law was not clearly established that he had a duty to intervene in that scenario; Nute disagrees.  White also contends that, even if the law was clearly established against him on that, it was not clearly established that he had a reasonable opportunity to intervene in the circumstances of this case.

### 2.  The Authority and Duty of an Alabama City Police Officer Outside of His City Limits

We can quickly dispense with Officer White's argument that as a police officer of the City of Rainsville, Alabama, he had neither the authority nor the duty to intervene to stop any unlawful use of force he saw happening in Fort Payne, Alabama.  We have already explained that is an issue of Alabama law, which clearly provides that a city police officer has the same law enforcement authority and duty throughout his county as he has in the city that employs him. *See supra* at 10–11.  For present purposes, the ongoing assault that White witnessed in the county jail in another city may as well have been committed in the Rainsville city jail.

### 3.  When the Excessive Force is Being Inflicted by Those Employed by a Different Government

Officer White points out that the jailers who actually inflicted the excessive force on Nute were not employed by the City of Rainsville, as he was, but "by another law enforcement agency" and, as a result, he had no authority over them. The premise of his argument is that because he had no authority over the jailers using excessive force, there can be no liability for failure to intervene to stop them from doing so.

Officer White's no authority/no liability position is contrary to our precedent which clearly establishes that when "a police officer, *whether supervisory or not*, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Byrd*, 783 F.2d at 1007 (emphasis added). In *Byrd* the assaulting officer and the non-intervening officer were both simply an "Officer." *See id.* at 1004–07. Neither had authority over the other. *See id.* We've reiterated the statement in *Byrd* that a non-intervening officer may be held liable "whether supervisory or not" at least seven times since the *Byrd* decision was issued. *See Ireland v. Prummell*, 53 F.4th 1274, 1301 (11th Cir. 2022); *Helm v. Rainbow City*, 989 F.3d 1265, 1272 (11th Cir. 2021); *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019); *Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013) (attributing the quoted language to *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)); *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002); *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000); *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998).

And we have reached the same result in a number of decisions in the nearly forty years since our *Byrd* decision was issued. In other failure-to-intervene cases we have held that qualified immunity did not apply even though the rank of the officers involved was the same. *See, e.g.*, *Edwards v. Shanley*, 666 F.3d 1289, 1298 (11th Cir. 2012) (reversing grant of summary judgment based on qualified immunity to the non-intervening "Officer" where another "Officer" allowed his police dog to bite the non-resisting plaintiff for more than five minutes); *Salvato v. Miley*, 790 F.3d 1286, 1295, 1298 (11th Cir. 2015) (affirming denial of qualified immunity in a failure-to-intervene lethal force case where the non-intervening officer and the assaulting officer are both described as "Deputy"). Those decisions show that the duty to intervene is not dependent on supervisory authority.

Our clearly established law that a failure to intervene claim does not require that the defendant officer had authority over the officer inflicting excessive force makes good sense. As our *Byrd* opinion explained:

> [A] police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility . . . *must exist as to nonsupervisory officers who are present at the scene* of such summary punishment, *for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace.*

*Byrd*, 783 F.2d at 1007 (quoting *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)).  The duty of an officer  to intervene derives from the Constitution, not from a chain of command.

Under our clearly established law, Officer White had a duty to intervene when he watched three jailers beating for no apparent reason a helpless man whom he had arrested and delivered into the custody of those jailers.  It matters not for qualified immunity purposes that he had no supervisory authority over them.

### 4. A Reasonable Opportunity to Intervene

Officer White argues that he didn't have a reasonable opportunity to intervene because the assault happened so quickly and he was unarmed and outnumbered by three to one.  He also argues that he did intervene by calling his Rainsville Chief of Police from his automobile after he left the jail in Fort Payne.

### i. Sufficient Time to Intervene

We have recognized that there are circumstances where an officer is entitled to qualified immunity because the infliction of excessive force occurred too quickly for him to have had a reasonable opportunity to intervene.  For example, we affirmed the grant of summary judgment based on qualified immunity to an officer who stood nearby while another officer used pepper spray on the plaintiff for half-a-second to three seconds.  *See Brown v. City of Huntsville*, 608 F.3d 724, 730–31, 740 n.25 (11th Cir. 2010). We reasoned: "Because the relevant events happened so quickly, the record does not reflect any point at which [the non-intervening officer] could have intervened to prevent [the other officer's] use of

excessive force, especially pepper spray, on" the plaintiff. *Id.* at 740 n.25. But this is not a three-second case.

We also have decisions holding that there was an opportunity to intervene even though the use of excessive force did not go on for an extended period of time. In one case we reversed the grant of qualified immunity to a non-intervening officer who watched another officer's police dog bite a non-resisting plaintiff for "as long as *two minutes*." *Priester*, 208 F.3d at 925. The non-intervening officer stood several feet away with his flashlight on the scene of the dog attack and watched the entire event and was in voice contact with the other officer. *Id.* We held the non-intervening officer liable because he had observed the dog attack and had the opportunity to intervene but didn't. *See id.* In another case we affirmed the denial of qualified immunity to an officer who failed to stop another one from tasing an arrestee twelve times. *Salvato*, 790 F.3d at 1289. The non-intervening officer had enough time to call for medical assistance, get her flashlight off the ground, and take the other officer's handcuffs to restrain the arrestee. *See id.* at 1290. She admitted that she was capable of telling the other officer to stop, *id.* at 1291, and we concluded that she had an opportunity to intervene but didn't, *id.* at 1295.

The record in the present case, including the surveillance video, shows that the assault took place for twenty-seven seconds from the time it started in Officer White's presence until he left the scene. The record also shows that the assault continued for six-and-a-half minutes after White had walked out of the door without

saying anything.  That's a total time of about seven minutes from the start to finish of the beating.

Obviously, where excessive force is being inflicted in violation of the Constitution an officer witnessing it cannot voluntarily leave the scene and then be let off the hook because he did not stay there long enough to intervene.  If he had not left so he wouldn't have to witness the assault (as a jury could find), Officer White would have had seven minutes to intervene.  Our precedent clearly established that is long enough to provide an opportunity to intervene, even if only verbally.  *See Priester*, 208 F.3d at 925; *Salvato*, 790 F.3d at 1290–91, 1295; *Edwards*, 666 F.3d at 1298 (reversing grant of summary judgment based on qualified immunity to the non-intervening officer where he failed to intervene while another officer's police dog attacked a non-resisting arrestee for more than five minutes).

## ii.  Unarmed and Outnumbered

Officer White argues that he was unarmed and outnumbered because there were three jailers and only one of him.  That does not excuse his failure to say something to the jailers in an attempt to get them to stop physically abusing the helpless detainee.  Or to say something about it to someone else at the jail.

It had been clearly established for almost twenty years before the incident in this case that an officer has a duty to at least *say something* in an attempt to stop a clear and continuing use of excessive force on a helpless arrestee.  *See Priester*, 208 F.3d at 922, 925, 927–28 (reversing the grant of qualified immunity to a sergeant

who failed to intervene, and noting that he reasonably could have intervened by telling an officer to restrain his police dog that had attacked the plaintiff for two minutes); *see also Jackson v. City of Atlanta*, 97 F.4th 1343, 1362 (11th Cir. 2024) (citing *Priester*, 208 F.3d at 923–28). It is uncontested that Officer White did *nothing* at the jail. Saying something might not have made any difference, but we will never know because White left the jail without uttering a word about the assault to anyone.

### iii. The Phone Call

Finally, Officer White asserts that he actually did do something. He points to his post-deposition affidavit which says: "I then left the jail and got in my vehicle and called my police chief and told him what had happened. He told me he would talk to the jail administrator." White's affidavit does not say when his chief of police in Rainsville said he would talk with the jail administrator or whether he ever did. In any event, this is a failure to *intervene* case, not a failure to report case. Not only that but at the time he made the phone call White was in his car outside the jail in Fort Payne where the assault was taking place. He was in a better position to urge the administrator of the jail there to stop it than his chief of police was.

The facts are that Officer White delivered Nute into the custody of three jailers who almost immediately began physically beating him only a few feet from White. He did nothing to stop them. He did not even tell them to stop. Instead, he remained

silent as he witnessed the assault from just a few feet away and then left as the assault continued.

## C.  The Holding

We hold that in March of 2020 it was clearly established law that an arresting officer who delivers a helpless man to jail and hands him over to jailers who immediately proceed to beat and otherwise physically abuse the non-resisting man in the officer's presence violates the man's Fourth Amendment rights if he remains silent and leaves the scene of the assault while it is still ongoing.  This case does not present, and we do not address, whether the officer's duty to intervene would have been discharged if he had urged the jailers to stop their unlawful conduct.

We also hold that the duty to intervene is not discharged by a phone call to the officer's supervisor where, viewing the evidence in the light most favorable to the plaintiff, the supervisor was not in a location or position where he could intervene in time to stop the assault.

## III.  CONCLUSION

Officer White is not entitled to summary judgment on the Fourth Amendment failure to intervene claim against him, and the district court's denial of summary judgment to him on that claim is **AFFIRMED**.

We decline to exercise pendent appellate jurisdiction to review Nute's cross-appeal of the denial of his motion for summary judgment on liability for his failure to intervene claim against

23-10273                Opinion of the Court                21

White, *see supra* at 8 n.1.    Therefore, Nute's cross-appeal is **DISMISSED**.[3]

---

[3] Nute's "Motion to Strike or Exclude from Consideration Portion of White's Reply Brief Making Argument and Addressing New Issues Never Previously Raised or Argued" is **DENIED** as moot.