Panesa C. PAYNE, Plaintiff,

v.

DEKALB COUNTY; Eddie J. Moody, individually and in his official capacity as Police Chief of the DeKalb County Police Department; Albirdia J. Earls, individually and in her official capacity as an employee of the DeKalb County Police Department; and John A. Medina, individually and in his official capacity as an employee of the DeKalb County Police Department, Defendants.

No. CIV.A. 1:02–CV–2754.

United States District Court, N.D. Georgia, Atlanta Division.

March 25, 2004.

Clarence Cuthpert, Jr., Clarence Cuthpert, Jr. & Associates, Eric E. Wyatt, George William McGriff, George W. McGriff & Associates, Atlanta, GA, for Plaintiff.

Charles George Hicks, Elizabeth B. Taylor, Michelle Lynn Thomas, Stephen E. Whitted, William J. Linkous, III, Office of DeKalb County Attorney, Decatur, GA, James Edward Dearing, Jr., Office of James Edward Dearing, Atlanta, GA, for Defendants.

## ORDER

CARNES, District Judge.

This case is presently before the Court on Defendants' Motion for Summary Judgment [28] and Defendant DeKalb County Et Al.'s Motion for Order Permitting Supplementation of Their Motion for Summary Judgment [31]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Defendants' Motion for Summary Judgment [28] should be **GRANTED in part and DENIED in part** and Defendant DeKalb County Et Al.'s Motion for Order Permitting Supplementation of Their Motion for Summary Judgment [31] should be **GRANTED**.

## BACKGROUND

This case stems from an incident that occurred on the afternoon of November 3, 2000. Plaintiff Panesa Payne exchanged words with a young girl named Makia Clarke to the effect that Clarke should not ride her bicycle on plaintiff's property. Clarke's parents, defendant Albirdia J. Earls and her husband, Earnest Earls, subsequently went to plaintiff's home to confront her about the incident, and the conversation became heated. The Earls returned to their own home, where defendant Albirdia Earls, a DeKalb County police officer, phoned a magistrate judge who apparently informed her that plaintiff had committed simple assault upon her and her daughter. Defendant Earls then phoned 911, after which defendant John Medina, a DeKalb County police officer, was dispatched to the scene. Defendants Earls and Medina proceeded to plaintiff's home, where they arrested her for simple assault. The two charges of simple assault against plaintiff were subsequently nolle prossed, however.

Plaintiff now brings suit against these individual officers and DeKalb County,[1] alleging a variety of claims under both federal and state law, including malicious prosecution and false arrest. Plaintiff originally filed her complaint in the Superior Court of DeKalb County, and the defendants removed the case to this Court on October 8, 2002. (Notice of Removal [1] at 1.) This Court has original jurisdiction over plaintiff's claims made under federal law pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

Unless otherwise indicated, the Court draws the undisputed facts from "Defendants' DeKalb County, Moody, Earls, and Medina's Statement of Undisputed Material Facts to Which There is No Genuine Issue to be Tried" ("DSMF") [28]. Plaintiff Payne has violated Local Rule 56.1B(2) by failing to attach to her response to defendants' summary judgment motion "a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried." Plaintiff also failed to file a response to DSMF, again in violation of Local Rule 56.1B(2). "All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted." LR 56.1B(2), NDGa. As plaintiff failed to specifically controvert any of the facts contained in defendants' statement filed with their motion for summary judgment, she is deemed to have admitted all of them. *Id. See also Cong. Fin. Corp. (Southern) v. Commercial Tech., Inc.,* 910 F.Supp. 637, 645 (N.D.Ga.1995) (Carnes, J.). Nonetheless, if the Court could dis-

cern that the plaintiff has disputed a specific fact and pointed to evidence in the record supporting her version of events, the Court has viewed all evidence and factual inferences in the light most favorable to the plaintiff, as required on defendants' motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993).

Defendants Earls and Medina are both employed as DeKalb County police officers. (DSMF at ¶¶ 1, 2.) Defendant Moody is the Chief of Police for DeKalb County. (*Id.* at ¶ 3.) Prior to November 3, 2000, plaintiff had not known or had any contact with defendant Medina and defendant Moody. (*Id.* at ¶¶ 4, 5.) Plaintiff and defendant Earls did know each other prior to this date, however, because they were neighbors in the Oak Tree Estates subdivision located in Lithonia, Georgia. (*Id.* at ¶ 6.) The homes of plaintiff and defendant Earls were located on streets that run parallel to each other. (*Id.* at ¶ 7.) A small wooded area separated the houses, and the distance from plaintiff's property line to that of Earls was approximately 100 yards. (*Id.*) Plaintiff and Earls had met each other when Earls had gone to plaintiff's door to advise her of a prior community meeting, and they had also spoken to each other at one or two such community meetings. (Earls Dep. [34] at 16.)

Taking the facts in the light most favorable to plaintiff, as set out in her deposition, on the afternoon of November 3, 2000, plaintiff first saw defendant Earls' nine-year-old daughter, Makia Clarke, at

---

**1.** The DeKalb County Police Department was originally named as a defendant in this suit, but in an Order [6] dated November 26, 2002, this Court granted the Department's Motion to Dismiss. Conversely, in an Order [8] dated November 29, 2002, the Court granted plaintiff's motion to amend her Complaint to add DeKalb County as a defendant in the action.

around 3:00 p.m. (Payne Dep. [30] at 14.) Plaintiff was aroused from a nap by the girl, who was walking through plaintiff's yard as a shortcut to get to her house after she had gotten off the school bus. (*Id.*) Plaintiff saw Makia again at around 4:00, as Makia was riding her bicycle in plaintiff's yard. (*Id.*) Makia had a can or some other object dragging on her bike that made a noise and that thereby alerted plaintiff that the girl was riding her bike in plaintiff's driveway. (*Id.* at 19–20.) According to plaintiff, she then raised her bedroom window and told Makia not to ride her bike in her yard. (*Id.* at 20–22.) Plaintiff said, "You know what I'm going to say, don't you?" (*Id.* at 20–21.) Makia said something in reply to plaintiff, but plaintiff could not understand what she said, so plaintiff then said, "Do not ride your bike in my yard." (*Id.* at 21–22.) Makia just looked at plaintiff, who then asked, "You were over here earlier today, weren't you?" (*Id.* at 22.) Makia answered yes, that she and her friends had been there. (*Id.*) At that point Makia at first continued to ride through plaintiff's yard, so plaintiff pointed to the street and told her to "[t]urn around and go that way." (*Id.*) Makia then turned around and left plaintiff's yard. (*Id.* at 22–23.) The entire incident lasted only about one minute. (*Id.* at 23.) According to plaintiff, she had previously mentioned to the parents present at a homeowners' meeting that she had a problem with the neighborhood children playing in her yard and using it as a shortcut to get to and from the bus stop. (*Id.* at 25.) Plaintiff also frequently instructed children that she saw in her yard,

including Makia, not to use her yard to ride their bikes or to walk through.[2] (*Id.* at 27.)

After Makia had left, plaintiff got back into bed and began reading a book. (*Id.* at 28.) Approximately ten to fifteen minutes later, plaintiff heard another noise and again looked out the window. (*Id.* at 29.) She then saw Makia's brother, who appeared to be about seven or eight years old, in the street on some roller blades. (*Id.* at 29–30.) The boy was skating directly toward her yard, so she tapped on the window and shook her head from left to right, "as to say don't come over here . . ." (*Id.* at 29.) The boy, who appeared startled, acknowledged plaintiff looking at him and left. (*Id.*) Plaintiff then went back to try to read her book. (*Id.* at 30.)

About fifteen minutes later, plaintiff heard a knock on her door. (*Id.* at 31.) After looking out the window and seeing defendant Earls and her husband standing outside, plaintiff got dressed and answered the door. (*Id.*) Defendant Earls introduced herself, and plaintiff said that she knew who she was. (*Id.*) Though defendant and her husband are both police officers, neither of them wore their uniforms that day, nor did they identify themselves as officers during their conversation with plaintiff. (DSMF at ¶ 12.) According to plaintiff, at the beginning of the conversation, defendant Earls asked her if her daughter had been there earlier that day, "and just from that point on, we just had attitudes, both of us." (Payne Dep. [30] at 31.)

---

**2.** Defendant Earls testified that Makia's account of the incident was very different from plaintiff's. According to defendant, upon reaching home, Makia told defendant that, as she was riding her bike near plaintiff's driveway, plaintiff told her, "If you come in my yard I'm going to kick your A[ss]." (Earls Dep. [34] at 20.) Plaintiff avers that she never used the word "ass" toward Makia, (Payne Dep. [30] at 37), and taking the facts in the light most favorable to plaintiff, the Court must assume that the comment did not occur. With regard to Makia, however, the Court will assume that she did tell defendant Earls that plaintiff said this.

Plaintiff told defendant that she had asked defendant's son and daughter not to ride their bikes in her yard and had seen defendant stand on her back porch and look on as her daughter used plaintiff's yard as a shortcut to get to the school bus in the mornings. (*Id.* at 31–32.) According to plaintiff, defendant "did not like that statement," and defendant's husband told her to go out to the street. (*Id.* at 32.) Defendant then went and stood in the street while plaintiff and defendant's husband continued to discuss the situation. (*Id.*) Plaintiff asserts, though, that defendant did not remain in the street but instead engaged plaintiff in a heated conversation and came back into her yard, "raising her hands as to say we can settle this right now. She had her hands raised at me." (*Id.* at 33.) According to plaintiff, defendant "had her hands up, fists pointing at me, ranting and raving." (*Id.*) Plaintiff took these gestures to be a threat. (*Id.*) Plaintiff started "talking right back at her." (*Id.* at 36.) Plaintiff then told defendant that she had lost her mind and that she was on private property and had to leave. (*Id.* at 33–34, 36.) Defendant's husband then told plaintiff she did not have to worry about the kids ever coming back into her yard, and plaintiff said, "Look, I don't want to fight. I want the kids to stay out of my yard." (*Id.* at 34.) Defendant's husband reiterated that plaintiff would not have to worry about the kids coming back there, and he and defendant then left. (*Id.* at 34–35.) According to plaintiff, as defendant was leaving her driveway, plaintiff heard her

saying, "Okay, 3433,[3] I've got something for you." (*Id.* at 34.)

In plaintiff's estimation, the entire encounter between her and the defendant and defendant's husband lasted about two minutes. (*Id.* at 36–37.) Once the "[h]eated yelling and screaming" between plaintiff and defendant started, it was only about thirty seconds longer until defendant and her husband left. (*Id.* at 36.) According to plaintiff, she never used the word "ass" during the entire conversation.[4] (*Id.* at 37.)

Once back in her home, defendant Earls concluded that she had probable cause to believe that plaintiff had assaulted and/or would assault her daughter and herself. (DSMF at ¶ 16.) Defendant then placed a telephone call to Magistrate Judge Allen C. Harvey and allegedly recounted the details of her daughter's encounter with plaintiff as well as those of the incident that she had personally experienced while at plaintiff's home. (*Id.* at ¶ 17.) Defendant Earls asked Judge Harvey if any charges were warranted against plaintiff, and he replied that simple assault charges could be issued against plaintiff for defendant and her daughter. (*Id.* at ¶ 18; Earls Dep. [34] at 36.) Defendant was not on duty as a DeKalb County police officer at the time that she placed this call, and she was acting as a private citizen. (Earls Dep. [34] at 36.)

Defendant Medina of the DeKalb County Police Department responded to defendant Earls' home pursuant to the 911 call, and defendant Earls informed him what had happened. (DSMF at ¶ 19.) Earls

---

3. Plaintiff's address was 3433 Oak Tree Way. (Payne Dep. [30] at 5.)

4. Again, defendant Earls has given a different account of this encounter. Earls testified that plaintiff told her that Makia was about to come into plaintiff's yard, so she told Makia that she "was going to kick her ass." (Earls Dep. [34] at 22.) According to defendant, plaintiff also told her that she would kick her ass as well, if she did not leave plaintiff's yard. (*Id.* at 26, 32.) The Court must take the facts in the light most favorable to plaintiff; as plaintiff has denied that she made these comments, the Court must assume that she did not.

told Medina that plaintiff had told her daughter that if she didn't get out of plaintiff's yard, plaintiff was going to kick the child's ass. (Medina Dep. [35] at 20.) Earls further informed Medina that she had gone to plaintiff's home, where plaintiff confirmed that she made that statement and told Earls that if she did not get out of her yard that she was going to kick her ass, too. (*Id.*) Because defendant Earls told Medina that the magistrate court judge had informed Earls that he would sign a warrant for plaintiff's arrest, Medina then proceeded to plaintiff's home to execute the arrest. (*Id.* at 21.) Defendant Earls also went around to plaintiff's home, though she did not ride with Medina in his patrol car to get there. (*Id.* at 19–20.) After Medina knocked on plaintiff's door and plaintiff answered it, defendant Earls showed plaintiff her badge and informed plaintiff that she was under arrest for simple assault. (DSMF at ¶¶ 16, 17.)[5] Medina asked Earls if it was okay for them to enter plaintiff's house, and Earls replied, "Oh, yes, it is okay, because I have already talked to Judge Harvey." (Payne Dep. [30] at 41.) Medina handcuffed plaintiff, but then allowed her to walk to her bedroom to get her sandals and to look for her purse. (DSMF at ¶ 19.)[6] Medina then secured the front and rear doors of plaintiff's house before placing her in his patrol car. (*Id.*)

Defendant Earls followed defendant Medina's patrol car as he transported plaintiff to the jail. (*Id.* at ¶ 20.) Defendant Earls then proceeded to obtain the arrest warrants from Judge Harvey according to their earlier conversation. (*Id.*) Defendant Earls obtained two arrest warrants, each signed by Judge Harvey, for a count of simple assault on herself and her

daughter, and she took them to the jail where plaintiff was being held. (*Id.* at ¶ 21.) The affidavit for the issuance of each warrant lists defendant Earls as the prosecutor and applicant for the warrant. (Payne Dep. [30] at Ex. C.)

The two criminal charges for simple assault against plaintiff were eventually nolle prossed pursuant to an order entered on September 5, 2001. (DSMF at ¶ 25.) Plaintiff requested and received the expungement of her local criminal history records, which was completed on March 5, 2003. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. (hereinafter, "Pl.'s Opp'n") [32] at Ex. B.)

More than one year after the November 3, 2000, incident, plaintiff voluntarily chose to move from the Oak Tree Estates subdivision and to buy her sister's house, approximately two and a half miles away. (DSMF at ¶ 28.) Though plaintiff did not have any further encounters with defendant Earls, she "just didn't feel comfortable living in front of Ms. Earls." (Payne Dep. [30] at 68.)

Plaintiff utilized the DeKalb County Police Department's internal complaint system to file a complaint against defendants Earls and Medina. (DSMF at ¶ 26.) The department investigated plaintiff's allegations of misconduct regarding the events of November 3, 2000, and concluded that neither Earls nor Medina had done anything wrong. (*Id.*) Plaintiff has also acknowledged that defendant Moody, the Chief of Police of DeKalb County, did not do anything specifically as it relates to the facts giving rise to the incident in question. (*Id.* at ¶ 24.) Defendant Moody had no personal involvement with the arrest or prosecution of plaintiff and became aware

---

**5.** The paragraphs in DSMF are misnumbered. The numbers go from 1 to 19 and then back to 16. The paragraphs 16 and 17 cited here appear on pages 5 and 6 of DSMF.

**6.** Here the Court is citing to the second paragraph 19, on page 6 of the DSMF.

of plaintiff's arrest only after the initiation of the instant lawsuit on September 6, 2002. (*Id.* at ¶¶ 27, 33.)

### DISCUSSION

#### I. *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence [7] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's

---

7. The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

case so as to create a genuine issue for trial.

## II. Federal Law Claims Against Individual Defendants in Their Individual Capacities

### A. Qualified Immunity

■ Defendants Moody, Earls, and Medina argue that they are protected from suit by the doctrine of qualified immunity. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. (hereinafter, "Defs.' Mot. for Summ. J.") [28] at 25–26.) Qualified immunity confers complete protection upon government officials sued in their individual capacities if their conduct " 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). An officer will be entitled to qualified immunity if his actions were reasonable, that is, if an objectively reasonable officer in the same situation could have believed that his actions were lawful. *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 638–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Qualified immunity allows government officials to carry out their discretionary duties without fear of personal liability or harassing litigation and protects from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* (quoting *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002)).

■ To receive qualified immunity, a public official must first demonstrate that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Id.* If a defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity. *Williams v. Consol. City of Jacksonville,* 341 F.3d 1261, 1267 (11th Cir.2003) (quoting *Lee,* 284 F.3d at 1194).

■■ If a defendant was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Vinyard,* 311 F.3d at 1346 (citing *Lee,* 284 F.3d at 1194). The Supreme Court has set forth a two-part test for use in qualified immunity analysis. The Court must determine whether the plaintiff's allegations establish a constitutional violation, and, if so, whether the constitutional right that the plaintiff seeks to assert was clearly established. *Id.* (citing *Hope v. Pelzer,* 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) and *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Therefore, the Court must first analyze whether the actions of defendants, under plaintiff's version of the facts, violated plaintiff's constitutional rights.

■ Plaintiff has brought this suit under 42 U.S.C. § 1983, which provides a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States.[8] *See Patsy v. Board of Regents of State of Fla.,* 457 U.S. 496, 502–08, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Mitchum v. Foster,* 407 U.S. 225, 238–42, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *McNeese v. Bd. of Educ. for Cmty. Unit Sch. Dist. 187,* 373 U.S. 668, 671–72, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). In

---

**8.** 42 U.S.C. § 1983 provides, in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

order to establish a claim under Section 1983, plaintiff must show a violation of a right secured by the Constitution of the United States, and also that the deprivation of that right was committed by a person acting under color of state law. *Loren v. Sasser,* 309 F.3d 1296, 1303 (11th Cir.2002) (citing *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)); *see also Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (" § 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred' ").

### 1. Defendant Moody

■ Plaintiff has made no allegation that defendant Moody was involved in her arrest or prosecution in any way. In fact, she has specifically admitted that Moody was not directly involved in the events of which she complains. (*See* Payne Dep. [30] at 60.) Nor has plaintiff alleged any causal connection between the alleged deprivation of her rights and defendant Moody. Rather, plaintiff appears to sue Moody solely on the basis of his supervisory authority as Chief of Police of DeKalb County over defendants Earls and Medina. "It is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Smith ex rel. Smith v. Siegelman,* 322 F.3d 1290, 1295 (11th Cir.2003) (quoting *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999)). Since plaintiff has failed to provide any facts indicating that Moody

participated in any way or was even aware of her arrest and prosecution, there obviously is no constitutional violation.[9] "Without a constitutional violation, there can be no violation of a clearly established right." *Id.* (citing *Burrell v. Bd. of Trustees of Ga. Military College,* 970 F.2d 785, 792 (11th Cir.1992)). Consequently, defendant Moody is entitled to qualified immunity, as well as summary judgment on the merits of the claim. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment [28] as to all claims made against him in his individual capacity.

### 2. Defendant Medina

■ Defendant Medina was clearly acting within his discretionary authority during the events in question. He was on duty, he answered a 911 call, he was greeted by a fellow police officer who recounted events that suggested to him probable cause to arrest the plaintiff, and he was also assured by defendant Earls that a magistrate judge had approved the arrest. (*See* Medina Dep. [35] at 19–21.) In fact, Medina testified that he was standing "right next" to Earls at the time that she called the magistrate and heard her give her version of the incident with plaintiff to the judge.[10] (*Id.* at 21–22.) Accordingly, defendant Medina was acting within his discretionary authority on the day in question. As to whether plaintiff has shown that qualified immunity is inappropriate as to him, the Court will address that in its discussion of each of plaintiff's separate federal claims.

---

9. Indeed, the uncontradicted evidence before the Court is that Moody did not become aware of plaintiff's arrest until after the initiation of this lawsuit. (Moody Dep. [36] at 29, 34.)

10. There seems to be some confusion in the record as to this point. Defendant Earls

seems to indicate in her deposition that she called the magistrate immediately upon returning home from plaintiff's house, before she placed the 911 call that caused defendant Medina to be sent to the scene. (*See* Earls Dep. [34] at 31.)

### 3. Defendant Earls

The facts currently before the Court, viewed in the light most favorable to plaintiff, suggest that defendant Earls was not acting within her discretionary authority as a police officer when causing the arrest of plaintiff, but was instead acting as a private citizen seeking the arrest of a neighbor with whom she had simply had a quarrel. Although the facts are disputed, the accounts of all parties show that there was definitely a quarrel between Earls and plaintiff and that both individuals were angry. According to plaintiff, Earls made threatening gestures and comments toward her during the incident in question. Plaintiff stated that Earls was "ranting and raving" and was pointing at plaintiff, "raising her hands as to say we can settle this right now.... She had her hands up, fists pointing at me ..." (Payne Dep. [30] at 33.) Defendant Earls, who was off-duty that day, called a magistrate judge after the quarrel. (Earls Dep. [34] at 36.) Earls made a 911 call, as a private citizen would do, (Medina Dep. [35] at 19), and when the call was answered told the officer what had happened and that the magistrate had approved the arrest. (*Id.* at 20–21.) Then Earls went with the responding officer, defendant Medina, to plaintiff's house. (*Id.* at 17–19.) After plaintiff came to the door, Earls identified herself as a police officer, both verbally and by flashing her badge. (Earls Dep. [34] at 39.) She then informed plaintiff that she was under arrest for simple assault. (*Id.* at 38; Medina Dep. [35] at 17.) Finally, on the applications for the arrest warrants for plaintiff, Earls stated that she was acting in both a personal and official capacity. Specifically, the applications indicated that the prosecutor was Officer A.J. Earls, acting as an agent for the DeKalb Police Department

*and* herself. (*See* Payne Dep. [30] at Ex. C (emphasis added).)

The above facts do not necessarily establish that Earls was acting within her discretionary authority as an officer, but instead more strongly suggest that she was acting as an angry private citizen attempting to have a neighbor with whom she was quarreling arrested. Moreover, the purpose of qualified immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. *Durruthy v. Pastor,* 351 F.3d 1080, 1087 (11th Cir.2003) (citing *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The doctrine recognizes that public officials will often be called upon to make "on-the-spot" decisions, without the opportunity to consult with others. Given the need to act quickly and decisively in circumstances that are often fast-changing and uncertain, a police officer acting within the scope of his responsibilities "need not err on the side of caution" and is "not obligated to be creative or imaginative in drawing analogies from previously decided cases." *See Rodriguez v. Farrell,* 280 F.3d 1341, 1350 (11th Cir.2002) (citations omitted). Here, however, defendant Earls did not face a fast-changing, potentially volatile situation that she was forced to grapple with as a police officer. Instead, after quarreling with her neighbor while admittedly off-duty, she returned to her own home, where, after being able to calmly assess the situation, she took the action that she now asserts was within her discretionary authority as a police officer.[11] Accordingly, the Court does not conclude that she was acting within her discretionary authority as an officer when she moved to have plaintiff arrested. In any event, the Court believes that the outcome of a qualified immunity analysis

---

11. Earls avers that she was the arresting officer in this case. (Earls Dep. [34] at 38.)

remains the same here, whether or not one deems defendant Earls to have been acting within her discretionary authority.[12]

## B. False Arrest

### 1. Legal Standard

 A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a Section 1983 claim. *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir.1996) (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)). "An arrest made with probable cause, however, constitutes an absolute bar to a Section 1983 action for false arrest." *Id.* (quoting *Marx*, 905 F.2d at 1505). For probable cause to exist, an arrest must be objectively reasonable under the totality of the circumstances. *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir.2002) (citing *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir.1998)). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (quoting *Rankin*, 133 F.3d at 1435) (internal quotes omitted). There is a "substantial difference" between the quantum of proof necessary to constitute sufficient evidence to establish probable cause and that necessary to support a conviction. *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir.2002)

(quoting *Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir.1996)). Probable cause requires more than suspicion but does not require convincing proof. *Lee*, 284 F.3d at 1195 (citing *Rankin*, 133 F.3d at 1435).

 To determine whether an officer has probable cause to make an arrest, one must first identify the elements of the statute used to arrest the suspect and compare the evidence, known to the arresting officer, with these elements. Plaintiff argues that the defendants did not have probable cause to suspect her of committing the offense of simple assault. "A person commits the offense of simple assault when he or she either: (1) Attempts to commit a violent injury to the person of another; or (2) Commits an act which places another in reasonable apprehension of immediately receiving a violent injury." O.C.G.A. § 16–5–20(a). The offense is complete if the assailant has made "such a demonstration of violence, coupled with an apparent ability to inflict injury so as to cause the person against whom it is directed reasonably to fear the injury unless he retreats to secure his safety." *Lewis v. State*, 253 Ga.App. 578, 580, 560 S.E.2d 73, 74–75 (2002) (quoting *Hise v. State*, 127 Ga.App. 511, 194 S.E.2d 274 (1972)). Because assault is an attempted battery, the state must show that a "substantial step" was made toward committing the battery in order to sustain a conviction for simple assault. *Id.* at 580, 560 S.E.2d at 75 (citing *Hamby v. State*, 173

---

**12.** Defendant Earls has not moved to dismiss the section 1983 suit against her on the ground that she was not acting under color of state law at the time of the events in question. *See Loren v. Sasser*, 309 F.3d 1296, 1303 (11th Cir.2002). Such a motion would likely have failed as defendant Earls ultimately used her official position to effect an arrest that likely would not have occurred had she been a private citizen making the complaint in question. That is, she obtained the permission of a magistrate judge to sign a warrant and

defendant Officer Medina acquiesced to the arrest, upon Earls's representation that she was obtaining a warrant. The Court assumes that the magistrate likely would not have taken the word of a private citizen on such a matter. Further, Earls later signed the affidavits for the arrest warrants in both her official and personal capacities, representing that she was acting as an agent for both the DeKalb Police Department and herself. (*See* Payne Dep. [30] at Ex. C.) Hence, the claim remains, but no qualified immunity exists.

Ga.App. 750, 751, 328 S.E.2d 224 (1985)). "Furthermore, the mere threat to commit a violent injury on a victim, without more, does not constitute an assault." *Id.* (citations omitted). There must be a present ability on the part of the assailant to inflict an immediate injury on the victim. *See Hamby v. State*, 173 Ga.App. 750, 751, 328 S.E.2d 224, 226 (1985) (holding that individuals who called a gas station attendant an obscene name and who threatened to "come back and get her," but who never got closer to the attendant than at least 70 feet and who took no steps to enter the station to injure her, did not commit the offense of simple assault as a matter of law); *Hudson v. State*, 135 Ga.App. 739, 740–41, 218 S.E.2d 905, 906 (1975) (holding that an individual's statement to officers that he was going into another room to get a gun to prevent them from arresting his mother could not create the apprehension of an immediate violent injury, and therefore would not authorize a verdict of guilty on the charge of simple assault).

### 2. Defendant Earls

Plaintiff argues that even under the facts as presented by the defendants, she had no present intent or ability to commit violence upon Earls or her daughter, but had only made a bare threat to do so if they trespassed upon plaintiff's property. (Pl.'s Opp'n [32] at 12–13.) Plaintiff asserts that she had no ability to inflict an immediate injury on defendant Earls because her husband was with her at the time and that she had no ability to inflict an injury on Makia Clarke because Makia was outside of her house and plaintiff inside of it when the alleged threat was made. (*Id.* at 13–14.) Defendants have not filed a reply brief disputing plaintiff's characterizations of the requirements of Georgia law, nor, in their own memorandum, did defendants even address the elements of the Georgia statute under which plaintiff was arrested. Accordingly, plain-

tiff's characterization of Georgia law stands unrebutted. Moreover, plaintiff's articulation of the requirements under Georgia law for an arrest based on the crime of simple assault appears correct to the Court. Assuming for the moment that defendant Earls was acting as a police officer, not a private citizen, the facts known to her under clearly established law, taking those facts in the light most favorable to plaintiff, would not have provided probable cause to arrest plaintiff.

Specifically, Makia was outside plaintiff's house on her bicycle when plaintiff instructed her, from inside the house, not to ride in plaintiff's yard. (Payne Dep. [30] at 20.) Further, plaintiff remained in the house during the entire exchange with the girl. Plaintiff raised her bedroom window and told Makia not to ride her bike in plaintiff's yard. (*Id.* at 21–22.) According to plaintiff, she did not even yell or raise her voice when giving Makia this instruction. (*Id.* at 21.) When Makia was initially unresponsive to plaintiff's direction, plaintiff then said, "Turn around and go the opposite direction," while pointing toward the street. (*Id.* at 22.) Makia then turned around and rode out of plaintiff's yard, and the entire incident only lasted for perhaps one minute. (*Id.* at 22–23.)

According to defendant Earls, when Makia arrived at home that afternoon, she reported that plaintiff had told her that she would kick Makia's ass. (Earls Dep. [34] at 20.) After Earls inquired why plaintiff would have said that, Makia told her that as she was about to ride her bicycle through plaintiff's yard, plaintiff told her, "If you come in my yard I'm going to kick your A[ss]." (*Id.*)

█ Even taking the facts as Makia relayed them to Earls, no reasonable officer could have believed that plaintiff committed simple assault on the child. Clearly, plaintiff did not attempt to commit a

violent injury to Makia's person, as she was just speaking to Makia through her open window. *See* O.C.G.A. § 16–5–20(a)(1). Plaintiff also did not commit an act which placed Makia in reasonable apprehension of *immediately* receiving a violent injury. *See* O.C.G.A. § 16–5–20(a)(2). Makia was on her bike, outside plaintiff's house, and was free to leave at any time, and plaintiff was inside her house, not within reach of Makia. As noted above, there must be "an apparent ability to inflict injury" in order for a threatened act to constitute simple assault. *Lewis*, 253 Ga.App. at 580, 560 S.E.2d at 74–75. Here, there was no such ability; plaintiff was inside of her house, Makia was outside of it on her bike, and Makia could (and did) simply leave the area at will. Moreover, "the mere threat to commit a violent injury on a victim, without more, does not constitute an assault." *Id.* at 580, 560 S.E.2d at 75. Here, even according to Makia, plaintiff only threatened to injure her, and only under the condition that she did not leave plaintiff's property. Even if events occurred just as Makia reported, plaintiff's bare threat alone could not, as a matter of law, constitute an assault. *Id.* If an individual's statement to officers that he was going into another room to get a gun to prevent them from arresting his mother could not create the apprehension of an immediate violent injury sufficient to constitute a simple assault, then plaintiff's alleged statement to Makia that plaintiff was going to kick Makia's ass *if* Makia did not leave, and made while Makia was outside plaintiff's house on a bike and while plaintiff was inside speaking out of an open window, certainly could not do so, either. *See Hudson*, 135 Ga.App. at 740–41, 218 S.E.2d at 906.

In sum, the Court is unaware of any Georgia case law that construes as an assault the statement made to a trespasser, "I will kick your ass if you do not get off my property." However inhospitable and coarse such a greeting might be, property owners are presumably accorded some license in the colorful language they may use to ask trespassers to vacate their property. In short, defendant Earls could not have reasonably believed on these facts that this speech allegedly uttered to her daughter could have constituted a simple assault.

In regard to the encounter between plaintiff and defendant Earls, the Court must again take the facts in the light most favorable to the plaintiff. According to plaintiff, defendant was ranting and raving at plaintiff and gesturing at her with raised fists, as if to suggest that she wanted to fight plaintiff. (Payne Dep. [30] at 33.) Plaintiff avers that she responded to these actions by telling defendant that she was on private property and that she had to leave. (*Id.* at 34–35.) According to plaintiff, she never used the word "ass" that day. (*Id.* at 37.) Under these facts, defendant Earls clearly had no probable cause to believe that plaintiff had assaulted her.

This conclusion would not change, even were the Court to construe the facts as Earls herself portrays them. According to Earls, plaintiff told her that she would kick her ass if Earls did not leave plaintiff's property. (Earls Dep. [34] at 32.) Even if this were the case, "the mere threat to commit a violent injury on a victim, without more, does not constitute an assault." *Lewis*, 253 Ga.App. at 580, 560 S.E.2d at 74–75. Earls does not indicate that plaintiff did any more than threaten her (again, conditionally, "unless you leave"), and a threat alone cannot constitute a simple assault. Even as Earls tells the story, she could have been under no reasonable apprehension of *immediately* receiving a violent injury. *See* O.C.G.A. § 16–5–20(a)(2). She was outside the house, was in no

imminent danger, and was the target of a demand alone.

Accordingly, even if defendant Earls was acting within her discretionary authority as a police officer when she caused plaintiff's arrest, on the facts known to her, she could not have reasonably believed, under clearly established law, that plaintiff had committed the crime of simple assault upon either Makia or herself.[13] Thus, defendant Earls is not entitled to qualified immunity, and the Court **DENIES** Defendants' Motion for Summary Judgment [28] as to Earls on this ground.

### 3. Defendant Medina

The Court notes that there are mitigating circumstances for Officer Medina that do not exist for Earls. First, defendant Medina was responding to a 911 call from Earls, and he received a rather abbreviated version of the facts. Without doubt, Medina received Earls' version of the events of that day. She told him that Makia was near plaintiff's house, and that plaintiff had told Makia that if Makia did not get out of plaintiff's yard, that plaintiff was going to kick Makia's ass. (Medina Dep. [35] at 20.) Earls further told Medina about her subsequent visit to plaintiff's house; Earls told Medina that plaintiff had confirmed that she said this to Makia and then allegedly told Earls that if she did not get out of her yard, she was going to kick her ass, too. (*Id.*) Further, what apparently persuaded Officer Medina to make the arrest was defendant Earls' assurance that a magistrate judge had approved the arrest and would soon issue a warrant. (*Id.* at 21–22.)

Just as defendant Earls should have been aware that plaintiff's alleged threats alone could not constitute simple assault, arguably so should defendant Medina have been on the same notice. However, given the manner in which Medina learned about the case and the limited details which he received from defendant Earls (and all told from her point of view), the Court determines that Medina had arguable probable cause for the arrest of plaintiff. Arguable probable cause is " 'all that is required for qualified immunity to be applicable to an arresting officer.' " *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir.2002) (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir.2001)); *see also Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir.1997) (holding that an officer need only have arguable probable cause in order to be entitled to qualified immunity). Arguable probable cause exists " 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest.' " *Lee*, 284 F.3d at 1195 (internal citations omitted). In determining whether arguable probable cause exists, the Court must apply an objective standard, asking whether the officer's actions are objectively reasonable regardless of the officer's underlying intent or motivation. *Id.* (quoting *Vaughan v. Cox*, 264 F.3d 1027, 1036 (11th Cir.2001)). "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into

---

**13.** Viewing the facts in the light most favorable to plaintiff, defendant Earls could not even have had arguable probable cause to arrest her for simple assault. *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir.2002) (holding that probable cause is " 'all that is required for qualified immunity to be applicable to an arresting officer' "). No reasonable officer in the same circumstances and possessing the same knowledge as defendant Earls could have believed that probable cause existed to arrest plaintiff. *Id.*

prosecutors." *Id.* (quoting *Scarbrough,* 245 F.3d at 1302–03).

■■■ Here, based upon the limited knowledge that defendant Medina had about the two encounters between plaintiff and Makia and plaintiff and defendant Earls, he could have believed that probable cause exited to arrest plaintiff. Earls told him only that Makia was near plaintiff's house when plaintiff allegedly threatened to kick her ass if she did not leave plaintiff's property. The record does not establish that Medina knew how close Makia was to plaintiff when the threat was uttered. Medina could therefore conceivably have believed that plaintiff was in close physical proximity to Makia at the time, placing the child in some imminent physical danger. A reasonable officer in these circumstances and possessing only this knowledge could have believed that probable cause existed to arrest plaintiff. *Lee,* 284 F.3d at 1195.

The same is true about the charge of simple assault against plaintiff in connection with her encounter with defendant Earls. Again, Earls gave Medina only limited facts; Earls apparently did not mention that there was a large physical distance between plaintiff and herself at the time the alleged threat was made and also apparently did not mention that her husband was present during the confrontation with plaintiff. (Medina Dep. [35] at 20.) Again, given these limited facts, Medina might well have assumed that plaintiff was in close physical proximity to defendant Earls at the time of the alleged threatening comments, and that defendant Earls could have been in reasonable apprehension of immediately receiving a violent injury. *See* O.C.G.A. § 16–5–20(a)(2). A reasonable officer in these circumstances and with Medina's knowledge of the situation could have believed that probable cause existed to arrest. *Lee,* 284 F.3d at 1195.

The most persuasive point in Medina's favor is the fact that defendant Earls assured him that she had explained the situation to a magistrate judge, and that the judge had approved the arrest of plaintiff and would soon issue a warrant for it. (Medina Dep. [35] at 21–22.) In determining whether probable cause exists, the Court must ask whether an officer's actions were objectively reasonable, regardless of the officer's underlying intent or motivation. *Lee,* 284 F.3d at 1195. In this case, Medina heard only a brief factual description of events between plaintiff and Makia and plaintiff and defendant Earls. He then received information that, based on these facts, a judge had agreed that arrest was proper and would issue warrants. Defendant Medina had no interest in the events of that day other than as an uninvolved officer summoned on a 911 call. Given the information he possessed and the knowledge that a judge had okayed the arrest, his actions were objectively reasonable. It is unlikely that many officers would have hesitated to take the same actions he did, when placed in that situation.

The Court therefore determines that defendant Medina had arguable probable cause for the arrest of plaintiff on simple assault charges against Makia and defendant Earls. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment [28] as to defendant Medina on the issue of false arrest based upon qualified immunity grounds.

## C. Malicious Prosecution

■■■ Malicious prosecution is a violation of the Fourth Amendment and a viable constitutional tort cognizable under Section 1983. *Wood v. Kesler,* 323 F.3d 872, 881 (11th Cir.2003) (citing *Uboh v. Reno,* 141 F.3d 1000, 1002–04 (11th Cir. 1998)) (additional citations omitted). To

establish a federal malicious prosecution claim under Section 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution. *Id.* (citations omitted). The Eleventh Circuit has looked to both federal and state law to determine those elements. *Id.* (citations omitted). For example, in *Uboh v. Reno,* the court examined both federal law and Georgia law and concluded that, for purposes of a Section 1983 malicious prosecution claim, the elements of the common law tort of malicious prosecution included: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the accused's favor; and (4) caused damage to the plaintiff accused. *Id.* at 881–82 (citing *Uboh,* 141 F.3d at 1004). "[A]lthough both state law and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." *Id.* at 882.

■ Plaintiff has failed to state a valid malicious prosecution claim against defendant Medina. That is, Medina did not institute or continue the prosecution of plaintiff. Defendant Medina simply made an arrest following his response to Earls' 911 call and based on defendant Earls' representation that a warrant was forthcoming.

■ Plaintiff has however adduced evidence against defendant Earls sufficient as to each element of the claim. Plaintiff's proof on the third and fourth elements is clear: the prosecution terminated in plaintiff's favor and she suffered damage, including the humiliation and emotional distress of sitting in a jail cell for thirty-four hours on a charge that was ultimately nolle prossed. As to the first element, defendant Earls clearly instituted the prosecution. Indeed, she signed the application for a warrant and provided an affidavit.

With regard to the second element, the Court has already concluded that there was no probable cause for the arrest. Further, plaintiff has adduced sufficient facts from which one could infer malice. A reasonable jury could conclude that defendant Earls caused plaintiff's arrest and prosecution for no reason other than spite toward plaintiff and an effort to gain the upper hand in their neighborhood spat. Further, in the affidavit that defendant Earls submitted for the arrest warrant in regard to the assault charge on Makia, she did not state that Makia was outside, some distance from the house, and that plaintiff was inside, at the time of the alleged threat. (*Id.* at Ex. C.) She also did not mention the conditional nature of the alleged threat; she simply indicated that plaintiff stated she *would* kick Makia's ass, which a reasonable reader could construe as meaning that plaintiff was standing near Makia, who would then arguably be in imminent danger. (*Id.*) In regard to the second warrant affidavit, relating to the assault charge on defendant Earls, defendant Earls also seems to have misstated what happened, if one takes the facts in the light most favorable to the plaintiff. The affidavit states that plaintiff walked toward Earls and said that she would kick her ass. Plaintiff, however, has testified that she never walked toward defendant, but rather, it was defendant who came back onto plaintiff's property and made threatening motions toward her. Second, defendant has testified that plaintiff stated that she would kick her ass *if* she did not leave plaintiff's yard. (Earls Dep. [34] at 32.) Yet, the warrant affidavit does not give the conditional nature of the alleged threat, leading a reasonable reader to con-

clude that defendant might actually have been in imminent danger. The conceivable omission and distortion of key facts in the warrant affidavits, combined with the other facts of the case, arguably reinforces a notion of malice toward plaintiff.

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment [28] on the malicious prosecution claim as to defendant Medina but **DENIES** it as to defendant Earls.

### D. Due Process Clause Claim

The Court has had considerable difficulty figuring out this claim. As best the Court can determine, plaintiff argues that "since there is a factual dispute as to what happened prior to the arrest, a jury should be able to decide whether or not Plaintiff was arrested and jailed as punishment for a crime that the arresting officer knew she did not commit." (Pl.'s Opp'n [32] at 23.) This is just another way to argue that summary judgment on the prior claims should be denied, which the Court has done. Accordingly, the Court therefore **GRANTS** Defendants' Motion for Summary Judgment [28] on this issue.

### E. Fourth Amendment Seizure Claim

Plaintiff argues that under the facts and circumstances of this case, a reasonable jury could conclude that defendant Earls went to plaintiff's home on November 3, 2000, not merely as a concerned neighbor and parent, but instead in order to provoke plaintiff into an argument so that defendant could have her arrested for simple assault. (Pl.'s Opp'n [32] at 26–27.) Plaintiff further argues that defendant Earls misled Magistrate Judge Allen C. Harvey when she telephoned him on November 3

to inquire if any charges might be issued against plaintiff. (*Id.* at 27.) According to plaintiff, Earls "knew that a magistrate judge could not issue a warrant to an ordinary citizen over the telephone and that a citizen would have to personally go before the magistrate." (*Id.*) Therefore, according to plaintiff, Earls had to have misled Judge Harvey into believing that she was acting in her capacity as an officer when she obtained the warrant for plaintiff's arrest. (*Id.*) "There is also no evidence in the affidavit in support of the warrant informing the magistrate that the alleged simple assault arose out of a neighborhood dispute where a minor child had trespassed upon a neighbor's yard." (*Id.*)

 A warrant is void under the Fourth Amendment if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth. *Dahl v. Holley,* 312 F.3d 1228, 1235 (11th Cir.2002) (citing *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).[14] This rule also applies to information omitted from warrant affidavits, so that a warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit. *Madiwale v. Savaiko,* 117 F.3d 1321, 1326–27 (11th Cir.1997) (quoting *United States v. Martin,* 615 F.2d 318, 329 (5th Cir. 1980)). A party need not show by direct evidence that the warrant affiant made an omission recklessly. *Id.* at 1327. "Rather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.'" *Id.* (citing *Martin,* 615 F.2d at 329). Omissions that are only

---

**14.** Though *Franks* involved a search warrant, the Eleventh Circuit has applied its rule in a case challenging an improperly obtained arrest warrant. *See Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994) (citing *United States v. Martin,* 615 F.2d 318, 327–29 (5th Cir.1980)).

negligent or that are insignificant and immaterial will not invalidate a warrant. *Id.* (citing *United States v. Reid,* 69 F.3d 1109, 1114 (11th Cir.1995)). And "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Id.* (citing *United States v. Jenkins,* 901 F.2d 1075, 1080 (11th Cir. 1990)). Further, omissions that are insignificant and immaterial will not invalidate a warrant. *Madiwale,* 117 F.3d at 1327.

In the instant case, plaintiff seems to be arguing that defendant Earls made a material omission by not informing the magistrate judge that she was not on duty as a police officer at the time the incident with plaintiff occurred. Plaintiff asserts that a magistrate would not issue an arrest warrant to an ordinary citizen over the telephone. That may be true, but the magistrate did not issue a warrant over the telephone to Earls in this instance, anyway. Earls telephoned the judge to inquire what charges might be brought against plaintiff, and the judge told her. After plaintiff was arrested, Earls then went before the magistrate in person to secure the arrest warrants for plaintiff. This confirms Earls' own statement in her deposition that a warrant cannot be issued unless a person is personally in front of the judge. (Earls Dep. [34] at 37.) As to her telephone call to the judge to ask for advice, Earls stated that any citizen can pick up a phone and call a judge to discuss a case and seek such advice. (*Id.* at 37–38.) Plaintiff has presented no evidence to contradict this statement.

Yet, as noted *supra,* there is a disputed issue of fact with regard to what happened between plaintiff and defendant Earls and her daughter, such that some of the statements in the affidavit for an arrest warrant are arguably incomplete or misleading. Nonetheless, the Court concludes that any such misleading statements by defendant Earls in obtaining a warrant are adequately addressed by plaintiff's malicious prosecution and false arrest claims. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment [28] as to this Fourth Amendment Claim, as being duplicative of the false arrest and malicious prosecution claims on which plaintiff will receive a trial.

### III. *Suit Against Individual Defendants in their Official Capacities*

Plaintiff has sued the individual defendants under 42 U.S.C. § 1983 in both their individual and official capacities. The United States Supreme Court has noted that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *Yeldell v. Cooper Green Hosp., Inc.,* 956 F.2d 1056, 1060 (11th Cir.1992). In an official capacity suit, only the assets of the governmental entity are available to satisfy a plaintiff's claims. *Yeldell,* 956 F.2d at 1060. When a plaintiff chooses to sue a local governmental entity directly, it is then merely superfluous and adds nothing to the plaintiff's case also to name as defendant the individual official acting in his or her official capacity. *See Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991); *Gibson v. Hickman,* 2 F.Supp.2d. 1481, 1482 (M.D.Ga.1998) (Owens, J.). Thus, naming the individual defendants in their official capacities in a suit in which DeKalb County is also a named defendant is the equivalent of naming the same defendant repeatedly. *See, e.g., Busby,* 931 F.2d at 776 ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no

longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly."); *see also Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1245 (6th Cir.1989); *Johnson v. Kegans,* 870 F.2d 992, 998 n. 5 (5th Cir.1989).

Therefore, because of the redundancy of naming the individual defendants in their official capacities, the Court **DISMISSES** all claims made against the individual defendants in their official capacities. Accordingly, the Court **GRANTS** DeKalb County's Motion for Summary Judgment [28] with respect to the claims made against the individual defendants in their official capacities.

## IV. *Suit Against DeKalb County*

▬▬▬ A municipality may be held liable under Section 1983 for a single illegal act committed by one of its officers, but not on a theory of *respondeat superior. Scala v. City of Winter Park,* 116 F.3d 1396, 1397 (11th Cir.1997). Instead, a plaintiff seeking to impose liability on a municipality under Section 1983 must identify a municipal "policy" or "custom" that caused the plaintiff's injury. *Wayne v. Jarvis,* 197 F.3d 1098, 1105 (11th Cir.1999) (quoting *Board of County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). " 'A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.' " *Id.* (quoting *Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir.1997), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998)). " 'A custom is a practice that is so settled and permanent that it takes on the force of law.' " *Id.* (quoting *Sewell,* 117 F.3d at 488).

▬▬▬ In the instant case, plaintiff alleges that DeKalb County is responsible for the alleged unconstitutional acts of de-fendants Earls and Medina under a theory of municipal liability because it inadequately trained defendants Earls and Medina. A municipality is not automatically liable under Section 1983 even if it inadequately trained or supervised its employees and those employees violated plaintiff's constitutional rights. *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998). "Instead, the Supreme Court has explained that there are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under § 1983." *Id.* (citing *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). These "limited circumstances" occur only when the municipality inadequately trains or supervises its employees, this failure to train or supervise is a municipal policy, and that policy causes the employees to violate a citizen's constitutional rights. *Id.* (citing *City of Canton,* 489 U.S. at 389–91, 109 S.Ct. 1197).

Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, a plaintiff may prove a municipal policy by showing that "the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Id.* To establish deliberate indifference, a plaintiff must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* (citing *Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)) (additional citations omitted).

▬▬▬ Plaintiff may meet this burden in one of two ways. First, "the need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or

should know that corrective measures are needed." *Young v. City of Augusta, Ga.,* 59 F.3d 1160, 1172 (11th Cir.1995) (citing *Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1397–98 (11th Cir.1994)). Plaintiff must submit evidence of a history of "widespread prior abuse" such that the municipality should be on notice of the need for improved training or supervision. *Gold,* 151 F.3d at 1351 (citing *Wright v. Sheppard,* 919 F.2d 665, 674 (11th Cir. 1990)). Second, the need for a particular type of training may be obvious where municipal employees face clear constitutional duties in recurrent situations even without prior incidents to place the municipality on notice. *Young,* 59 F.3d at 1172 (citing *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197). The Eleventh Circuit, however, has cautioned that "the Supreme Court has given only a hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." *Gold,* 151 F.3d at 1352 (quoting *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197).

Plaintiff has not addressed either of the two methods for showing that the county defendants were "deliberately indifferent" to the rights of citizens by failing to train. First, plaintiff has presented no evidence of prior incidents of any allegedly illegal behavior by defendants Earls or Medina. Plaintiff has not made any showing of a history of "widespread prior abuse" by these defendants or other officers, in their arrests of individuals for the offense of simple assault. Further, even if such incidents had occurred, plaintiff has not cited even one prior complaint that would have put the county on notice of such behavior. Thus, the Court concludes that the absence of evidence of prior instances of improper arrests for the offense of simple assault dooms plaintiff's contention that the county defendants were on actual or constructive notice of the need for further training or supervision in this area.

Second, plaintiff has not demonstrated that the failure to train was so obvious and the likelihood of constitutional violation so highly predictable that liability should attach for a single incident. Indeed, a comparison to the Supreme Court's hypothetical in *City of Canton* mentioned above shows that plaintiff cannot make such a demonstration. There, the Court stated that since municipal leaders know to "a moral certainty" that their police officers will be required to arrest fleeing felons, and the municipality arms its officers with firearms, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197.

█ Plaintiff's only evidence in this case of a failure to train on the part of the County comes from the deposition testimony of defendants Earls, Medina, and Moody. In each deposition, plaintiff's counsel asked the particular defendant to give the legal definition of simple assault. (*See, e.g.,* Earls Dep. [34] at 11.) Plaintiff argues that the defendants did not know the legal definition of and/or the elements of the crime of simple assault. (Pl.'s Opp'n [32] at 15.) Yet, that these defendants who are not lawyers could not give perfect, horn book definitions of the crime of simple assault during deposition testimony does not mean that they were inadequately trained. It cannot be said that county leaders would know to a "moral certainty" that a failure to train police officers so that they can recite elements of various crimes by rote in depositions would lead to wrongful arrests and constitutional violations. Training officers to memorize the definition of every single criminal offense in the

Georgia code cannot be said to rank in the same league as training them in the proper use of deadly force. Thus, this failure to train, if indeed it is a failure, cannot be said to be "deliberate indifference" to constitutional rights.

Moreover, it would appear that as to defendant Earls, the arrest had less to do with her ignorance of Georgia law than it had to do with her anger toward a neighbor. As to defendant Medina, again there are extenuating circumstances that explain his conduct: primarily, his belief that a magistrate was issuing an arrest warrant. Accordingly, as plaintiff cannot recover from defendant DeKalb County under her only proposed theory of municipal liability, the Court **GRANTS** Defendants' Motion for Summary Judgment [28] with respect to plaintiff's claims against DeKalb County.

## V. *State Law Claims*

### A. Sovereign Immunity of DeKalb County and Individual Defendants in Their Official Capacities

■ Plaintiff has alleged state tort law claims against defendants Moody, Earls, and Medina in their official capacities as well as against DeKalb County. Defendants argue that DeKalb County and the individual defendants in their official capacities are protected from suit on plaintiff's state law claims by the doctrine of sovereign immunity. (Defs.' Mot. for Summ. J. [28] at 30–31.) The Georgia Constitution reserves sovereign immunity "to the state and all of its departments and agencies" except as specifically waived by the State legislature. Ga. Const. Art. I, § 2, ¶ 9(e). The Georgia Supreme Court has held that sovereign immunity under this provision of the Georgia Constitution extends to the counties of this State. *Toombs County v. O'Neal*, 254 Ga. 390, 391, 330 S.E.2d 95, 97 (1985). The Eleventh Circuit has recently reiterated this

concept by stating: "Even if [the] County had any liability under state law, it is protected by state sovereign immunity. As a political subdivision of Georgia, a county and its officers sued in their official capacities have the same sovereign immunity protection as the state." *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1197 n. 36 (11th Cir.1994) (citing *Toombs County v. O'Neal*, 254 Ga. 390, 330 S.E.2d 95 (1985)). Georgia counties waive sovereign immunity to the extent that they have liability insurance coverage. *Id.* (citing *Kitchen v. CSX Transp., Inc.*, 6 F.3d 727, 731 (11th Cir.1993)). This issue has not been raised by either side in this case.

■ Moreover, Georgia law provides that "[a] county is not liable to suit for any cause of action unless made so by statute." O.C.G.A. § 36–1–4. In this case, DeKalb County is protected by sovereign immunity, because there has been no statutory waiver of sovereign immunity. *Woodward v. Gray*, 241 Ga.App. 847, 851–52, 527 S.E.2d 595, 600 (2000) (citing *Seay v. Cleveland*, 270 Ga. 64, 65, 508 S.E.2d 159 (1998)) (additional citations omitted). The Court therefore concludes that plaintiff's claims against DeKalb County and against the individual defendants in their official capacities are barred by the defense of sovereign immunity. Accordingly, the Court **GRANTS** the Motion for Summary Judgment [28] as to all of plaintiff's state law claims against DeKalb County and against the individual defendants in their official capacities.

### B. Official Immunity of Individual Defendants

■ The individual defendants argue that they are protected from suit on plaintiff's state law claims by the doctrine of official immunity. (Defs.' Mot. for Summ. J. [28] at 32–33.) The doctrine of official immunity, also known as qualified

immunity, affords public officers and employees limited protection from suit in their personal capacities. *Harvey v. Nichols,* 260 Ga.App. 187, 190, 581 S.E.2d 272, 276 (2003) (quoting *Cameron v. Lang,* 274 Ga. 122, 123, 549 S.E.2d 341 (2001)). "Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption." *Id.* (citation omitted). A public officer or employee may be personally liable only for ministerial acts negligently performed or for discretionary acts performed with malice or an intent to injure. *Id.* at 190–91, 581 S.E.2d 272, 581 S.E.2d at 276 (citation omitted). Whether a duty is ministerial or discretionary turns on the character of the specific act. *Reed v. DeKalb County,* 264 Ga.App. 83, 86, 589 S.E.2d 584, 587 (2003) (citing *Schmidt v. Adams,* 211 Ga.App. 156, 157, 438 S.E.2d 659, 660 (1993)). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Harvey,* 260 Ga.App. at 191, 581 S.E.2d at 276 (quoting *Schmidt,* 211 Ga.App. at 157, 438 S.E.2d at 660). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.* (citation omitted).

■ In this case, the decision by defendants Earls and Medina to arrest plaintiff was clearly a discretionary act. "[T]he operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function..." *Id.* (citing *Carter v. Glenn,* 249 Ga.App. 414, 417, 548 S.E.2d 110 (2001)). The decision to effec-

tuate a warrantless arrest is generally a discretionary act requiring personal judgment and deliberation on the part of the officer. *Reed,* 264 Ga.App. at 86, 589 S.E.2d at 587 (citing *Outlaw v. Nasworthy,* 250 Ga.App. 362, 364, 551 S.E.2d 785 (2001)). Defendants are therefore protected from plaintiff's state law claims by official immunity unless plaintiff can show that they acted with malice or an intent to injure. *Harvey,* 260 Ga.App. at 190–91, 581 S.E.2d at 276.

In the context of official immunity, malice requires a "deliberate intention to do wrong" and denotes "express malice or malice in fact." *Adams v. Hazelwood,* 271 Ga. 414, 414–15, 520 S.E.2d 896, 898 (1999) (quoting *Merrow v. Hawkins,* 266 Ga. 390, 391, 467 S.E.2d 336 (1996)). "While ill will may be an element of actual malice in many factual situations, its presence alone cannot pierce official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Id.* at 415, 520 S.E.2d 896, 520 S.E.2d at 898. Even conduct exhibiting a reckless disregard for the safety of others does not equate with the actual malice necessary to defeat a claim of official immunity. *Williams v. Solomon,* 242 Ga.App. 807, 809, 531 S.E.2d 734, 736 (2000) (citations omitted).

■ For the reasons stated above, plaintiff has failed to show any malice on defendant Medina's part, but has shown malice on defendant Earls' part.[15] Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment [28] as to all of plaintiff's state law claims against the defendants Moody and Medina in their individual capacities but denies summary judgment as to defendant Earls.

**15.** As defendant Moody did nothing to plain- tiff, he clearly lacked malice.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment [28] and **GRANTS** Defendant De-Kalb County Et Al.'s Motion for Order Permitting Supplementation of Their Motion for Summary Judgment [31].

In short, the Court has granted summary judgment as to all defendants except for defendant Earls, as set out above.